Filed 10/27/15 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>LEE ISAAC BEDWELL LEEDS,<br><br>    Defendant and Appellant. | 2d Crim. No. B243376<br>(Super. Ct. No. 1281737)<br>(Santa Barbara County)<br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed on September 28, 2015, be modified as follows:

1. On page 1, the first paragraph is deleted and replaced with the following:

A defendant accused of murder pleads not guilty by reason of insanity. He claims that when he killed he was in a delusional state which caused him to believe he was in danger of immediate great bodily injury or death and therefore was legally justified in acting in self-defense. Here we hold that the jury must be instructed that the defendant was legally insane if (1) he suffered from a delusional state and (2) his delusion, if true, would lawfully justify killing in self-defense. The trial court erred, however, in failing to give such an instruction and also erred when it instructed the jury that appellant's belief had to be "reasonable."

[There is no change in the judgment.]

Appellant's petition for rehearing is denied.

Filed 9/28/15 (unmodified version)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>LEE ISAAC BEDWELL LEEDS,<br><br>    Defendant and Appellant. | 2d Crim. No. B243376<br>(Super. Ct. No. 1281737)<br>(Santa Barbara County) |

A defendant accused of murder pleads not guilty by reason of insanity. He claims that his delusional state caused him to believe that he was acting in self-defense. Here we hold that an instruction on self-defense in the sanity phase must inform the jury that a defendant's delusion caused him to believe that he was in danger of great bodily injury or death that required the use of deadly force and that he would be legally justified in doing so.

Lee Isaac Bedwell Leeds shot and killed his father and three other men whom he believed were conspiring to kill him. He was charged with their murders (Pen. Code, §§ 187, subd. (a), 189)[1] and multiple murder special circumstance (§ 190.2, subd. (a)(3)) and gun use allegations (§ 12022.53, subds.

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

(b), (c), (d)). When Leeds was arraigned on the complaint his counsel informed the court that Leeds was incompetent to stand trial. (§ 1368.) Based on the reports of the appointed mental health experts, the trial court found him to be incompetent, suspended criminal proceedings, and committed him to Patton State Hospital. (§§ 1369, 1370.) Three years later, he was found competent (§ 1372) and criminal proceedings were resumed. (§ 1370, subd. (a)(1)(A).)

Leeds is a diagnosed paranoid schizophrenic. Pursuant to a plea agreement that precluded imposition of the death penalty, he entered pleas of guilty and not guilty by reason of insanity to four counts of first degree murder. (§§ 1016, subd. (6), 1026, subd. (a).) He claimed that due to the hallucinations and delusions caused by his mental illness he was legally insane when he committed the offenses because he believed that it was necessary to defend himself by killing the "conspirators" before they killed him. He admitted the special circumstance and gun use allegations. A jury found he was sane as to all four counts. The trial court sentenced him to state prison for four consecutive terms of life without the possibility of parole and four consecutive 25-year terms for the gun use enhancements.

Leeds contends that the jury was erroneously instructed that, in determining whether he was insane, his right to claim self-defense was to be measured by a reasonable person's "understanding that his act was morally or legally wrong." We conclude that he was legally insane when he killed the victims if, as a result of his delusion, the facts as he perceived them, even if erroneous, would entitle him to claim self-defense. We conclude that the trial court erred when it instructed the jury that to claim self-defense, Leeds's beliefs also had to be reasonable. By definition, the beliefs of a paranoid schizophrenic may not be those of a reasonable person presented with the same facts. As to three of the victims, however, the error was harmless. As we shall explain, his father could have been perceived as an immediate threat. We reverse as to that count.

2

Leeds also alleges error due to (1) the admission of testimony about the consequences of an insanity verdict; (2) a jury instruction on the consequences of an insanity finding; (3) the content of the jury questionnaire; and (4) cumulative error. We reject his other contentions of error. Accordingly, we affirm in part, reverse in part, and remand.

FACTS AND PROCEDURAL BACKGROUND

*Background*

Leeds's family owns Black Road Auto, a wrecking yard in Santa Maria. His father, Robert Leeds, and his father's business partner once owned a resort in Baja, Mexico. His father dissolved the partnership after discovering the partner was involved in selling drugs and in prostitution. Leeds knew that the partner threatened to send a Mexican drug cartel after Leeds's father.

Leeds was diagnosed with paranoid schizophrenia in 2000 when he was 22 years old. Approximately four months before the murders, he stopped taking his antipsychotic medication. His mental condition began to deteriorate. He became "weird." He often sat alone in the corner of a room, talking to himself and laughing for no apparent reason.

Leeds believed that the Mexican drug cartel had infiltrated his family's business and was turning it into a drug distribution system. He thought the cartel planned to kill him because he would not cooperate in transporting drugs and that his father had succumbed to the cartel's threats. He hired a private investigator to check up on Terry Majan, one of his father's employees, whom he believed was lying to and stealing from his father.

Leeds was concerned about a war he perceived being waged between Santa Barbara County and other counties in the south. He believed that there were missiles along the highway and that he saw one being fired. He was concerned that drug cartel members were looking for him and knew he might be leaving the area.

3

During this time Leeds withdrew money from his safe deposit box. While there he overheard one of the bank employees speaking on the phone about him, which made him suspicious. As he left the bank he ran into his brother Lorne, who asked him to take some saw blades to the office. Leeds believed he was followed from the bank by a banker in a silver Mercedes or pickup truck, causing him to drive through a hay field to get away. When he reached the wrecking yard, he gave the saw blades to his father.

Leeds had seen Majan and David Duboise, another employee, "high fiving" one another and heard them telling two others about how they were turning his father's business into a drug delivery business. He went into the back office and closed the door. He overheard voices on the business's walkie-talkies discussing how they were going to kill him. He believed that his father was being pressured by the drug cartel and had agreed to kill him. Leeds took a gun from the desk drawer. He also cut the power to the office in order to turn off the surveillance cameras and eliminate the noise from the fans.

While he was in the office, Leeds called a family law attorney, Buddy Jaquith, who had worked extensively with his father and brother. Leeds told Jaquith that four members of a Mexican drug cartel were coming into the wrecking yard and were going to kill him. When Jacquith asked what made him think that, Leeds said, "I don't know but the banker's also in on this." He sounded panicky. Jacquith told him to call 9-1-1 if he thought someone was going to harm him. Leeds asked Jaquith, "If I do something to . . . defend myself, will you defend me?" Leeds also called Tony Stevens, a security guard at Black Road Auto. Leeds told him there may be a shooting and asked him to escort Majan from the premises.

Because the electricity was out, Leeds's father went to the office. Unable to open the door, he tried to kick it open. The door opened. Leeds thought his father was brandishing a gun. He shot and killed him. When Leeds ran out of the office, he told Joyce Bowley, a nearby customer, to "take care of

4

my dad." He chased down, shot, and killed the remaining three victims: customer Richard Leal, Duboise, and after reloading, Majan. As Leeds later described it, "'I got a gun and went on them before they could do me in.'"

The police found him running towards and starting to climb over a fence. As they closed in, he hid behind a car crusher. When officers ordered him to get down on the ground and put his hands to his sides, he complied. During the initial interview, Detective Robert Morris felt that Leeds "was acting obviously different" and asked if he needed medication. Detective Morris contacted Dr. James Tahmisian, a clinical psychologist used by the police department, to evaluate his sanity.

*Sanity Trial*

*Defense Evidence*

Leeds has the burden of proving legal insanity by a preponderance of the evidence. (*People v. Elmore* (2014) 59 Cal.4th 121, 144-145.) He called several mental health experts, including Dr. Tahmisian, clinical psychologists Robert Owen and Jamie Rotnofsky, psychologist Jeffrey Davis, and forensic psychiatrist and clinical professor William Reid. Each of them diagnosed Leeds with paranoid schizophrenia and concluded that he was legally insane at the time of the killings. The experts opined that Leeds's acts were caused by his delusions and paranoid belief that the victims were part of a Mexican drug cartel and planned to kill him. They ruled out other possible motivations for the killings, such as animosity towards his father, antisocial personality disorder, psychopathy, or illegal drug use. Their opinions were based on factors including Leeds's well-documented history of delusions and hallucinations, his mother and sister also being diagnosed with schizophrenia, his history showing he had a strong moral sense and did not intentionally do anything wrong or hurt someone without cause, his fearful and panicky demeanor just before the killings, and his false belief that his father was brandishing a pistol when he kicked open the door to the back office.

5

Lay witnesses testified to Leeds's behavior and demeanor. Both his brother and stepmother described his relationship with his father as good. Leeds's stepmother testified that he had a kind heart and she did not know of any reason why he would kill his father and the others. In the months prior to the shootings, she had become concerned about Leeds's worsening mental condition. Stevens testified that Leeds sometimes would pause when greeted "because he was fighting whatever he had that was wrong with him." Leeds would tell Stevens that "bad voices" were telling him something that he did not want to do. A bank teller, who had known him for five years and on most days would engage him in normal conversation, thought he seemed agitated and preoccupied on the day of the shootings. When she called him by name, he did not respond and appeared to be mumbling to himself. Jaquith testified that when Leeds called him, he sounded incoherent and delusional based on the tenor of his voice and the frenzy with which he was speaking. Just before Leeds shot his father, Bowley thought he looked sick, with a "far away look on his face like he was going to pass out."

*Prosecution Evidence*

The prosecution called two forensic psychologists, only one of whom, Dr. Brandon Yakush, offered evidence on Leeds's sanity. Dr. Margaret Hagen, author of *Whores of the Court: The Fraud of Psychiatric Testimony and the Rape of American Justice*, opined that neither psychiatrists nor psychologists were any better qualified than a lay person to assess a patient's mental state. Moreover, because there were no objective means of scientifically confirming any given patient's mental state, such an opinion would be valueless. She did not interview Leeds and had no opinion whether he was schizophrenic or knew right from wrong at the time of the killings.

Dr. Yakush agreed with the defense experts that Leeds is a paranoid schizophrenic. However, he found that Leeds's behavior was "at odds with somebody who believed that they were morally justified in defending

6

themselves with deadly force against the Mexican Mafia" and "more consistent with somebody who decided to preemptively stop what he believed was going to happen." For example, for more than two years Leeds did not mention that members of the Mexican Mafia were after him when he spoke with Stevens, the police, or anyone else other than Jaquith. He did not make a phone call to 9-1-1 but called other people with phone numbers that he likely had to look up. Before the shootings, he did not attempt to hide even though there were many places to do so. He turned off the video surveillance system. Immediately after the shootings, instead of throwing down the gun and telling the police what had happened, Leeds ran towards the perimeter of the yard, got rid of the gun, the extra cartridges, and his outer clothing, and attempted to scale the fence. Other than his father, the victims were running or facing away from him when they were shot. Although Leeds reported that they had guns in their pockets, he did not claim to have seen them point their guns at him. Dr. Yakush opined that Leeds might have had multiple motives for the killings, such as his "serious problems" with Majan becoming close to his father and arguments with his father over money.

Several lay witnesses testified for the prosecution. Aida Williams, a family friend, thought that Leeds had a lot of animosity towards his father, who on more than one occasion belittled him in front of others by commenting on his lack of life accomplishments. Leeds's private investigator testified that Leeds felt his father was "leaning a little towards Majan and believing him instead of believing his son." Carol Robles, a bank teller who earlier had assisted Leeds on the afternoon of the shootings, did not notice anything different about the way he presented himself. Black Road Auto employees Cody Bunderson and Tristan Gallant testified that while they were taking cover from the bullets, Leeds told them, "you guys need to . . . leave the state, everything is going to hell and back."

Customer Dan Silva saw Leeds shoot Leal, first from a distance of 20-30 feet as Leal was walking away and then three or four more times as Leeds

7

stood over him. Leeds then shot Duboise as he was running away. Customer Brenten Brown was talking with Majan, who was on an idling tractor with nothing in his hands when Leeds shot him. Leeds said either, "Here you go" or "Check this out," and then shot Majan five to seven times. Leeds attempted to fire three more times after running out of ammunition.

DISCUSSION

*Instruction on Insanity and Self-Defense*

A person suffering from a delusion that causes him to fear that another is attempting to take his life is legally insane if the facts perceived as the product of his delusion would legally justify his acting in self defense. (*People v. Rittger* (1960) 54 Cal.2d 720, 732, quoting *M'Naghten's Case*, (1843) 10 Clark & Fin. 200, 211 [8 Eng.Rep. 718] [killer who "'labours under . . . partial delusion . . . must be considered in the same situation as to responsibility as if the facts with respect to which the delusion exists were real'"].) Here we are concerned with whether Leeds understood whether his conduct was legally wrong: As a consequence of his delusion, did Leeds believe that he was in imminent peril of great bodily injury or death? "'For example, if under the influence of his delusion [the defendant] supposes another man to be in the act of attempting to take away his life, and he kills that man, as he supposes, in self-defence, he would be exempt from punishment. If his delusion was that the deceased had inflicted a serious injury to his character and fortune, and he killed him in revenge for such supposed injury, he would be liable to punishment.'" (*People v. Rittger*, at p. 732; see *Finger v. State* (Nev., 2001) 117 Nev. 548, 576 ["Persons suffering from a delusion that someone is shooting at them, so they shot back in self-defense are insane under *M'Naghten*. Persons who are paranoid and believe that the victim is going to get them some time in the future, so they hunt down the victim first, are not"].)

Leeds contends that the trial court denied him due process and a fair trial because it refused his requested instruction defining morality as used in

8

the sanity instruction. Instead, the court instructed the jury on the law of self-defense to illustrate society's generally accepted standards of right or wrong. He argues that the trial court's modified instruction on insanity combined with the self-defense instruction improperly led the jury to apply the law of self-defense to his acts. The propriety of jury instructions is a legal question we review de novo. (*People v. Dowdell* (2014) 227 Cal.App.4th 1388, 1418.)

The trial court instructed the jury on the law of insanity using a modified version of CALCRIM No. 3450, California's version of the *M'Naghten* test. In relevant part, the trial court gave the standard instruction that "[t]he defendant was legally insane if: [¶] 1. When he committed the crimes, he had a mental disease or defect; [¶] AND [¶] 2. Because of that disease or defect, he was incapable of knowing or understanding the nature and quality of his act or was incapable of knowing or understanding that his act was morally or legally wrong." Only the second prong of the test was at issue.[2]

Defense counsel requested an additional instruction, derived from the discussion in *People v. Coddington* (2000) 23 Cal.4th 529 (*Coddington*),[3] that "[t]he morality contemplated by the Penal Code is not simply the individual's belief in what conduct is or is not good. While it need not reflect the principles of a recognized religion and does not demand belief in a God or other supreme being, it does require each of the following: [¶] 1. A sincerely held belief. [¶] 2. Grounded in generally accepted ethical or moral principles. [¶] THAT IS [¶] 3. Derived from an external source." Defense counsel argued that this instruction

---

[2] Defense counsel conceded to the jury that Leeds "understood the nature of his act" and argued that whether he understood the quality of his act was "included in the second [prong of the test] that he did not understand that it was morally or legally wrong.

[3] *Coddington* was overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069 & fn. 13.

was necessary because it was "the only statement of the law in terms of what is required for morality under the [CALCRIM No. 3450] instruction."

The trial court rejected the requested *Coddington* instruction. It nonetheless expressed concern that "the jury needs some basis of making a determination of what morally and legally wrong is." Over defense counsel's objections, the trial court read a modified version of CALCRIM No. 505 instructing jurors that they must accept it as "a standard jury instruction for the law of self defense."[4] In the modified portion of CALCRIM No. 3450, the trial court instructed the jury that "[t]he concept of morally and legally wrong refers to society's generally accepted standards, and not to the subjective standards of the defendant. [¶] You may consider any evidence defining self defense ONLY to assist you in determining what may be society's generally accepted moral and

---

[4] The instruction was as follows:

"The defendant is not guilty of murder if he was justified in killing someone in self-defense. The defendant acted in lawful self-defense if:

"1. The defendant reasonably believed that he was in imminent danger of being killed or suffering great bodily injury;

"2. The defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger; [¶] AND [¶]

"3. The defendant used no more force than was reasonably necessary to defend against that danger.

"Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. The defendant must have believed there was imminent danger of death or great bodily injury to himself. Defendant's belief must have been reasonable and he must have acted only because of that belief. The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation. If the defendant used more force than was reasonable, the killing was not justified.

"When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed."

10

legal standards. You should not specifically apply the law of self defense to the conduct of the defendant."

The trial court erred. First, the entire discussion of moral wrong, as distinguished from legal wrong, is misplaced. Whatever may be the standard for knowing an act is morally compelled is of no moment. It is true that "a defendant who is incapable of understanding that his act is morally wrong is not criminally liable merely because he knows the act is unlawful." (*People v. Skinner* (1985) 39 Cal.3d 765, 783.) Yet, "in most instances legal wrongfulness and moral wrongfulness are equivalent." (*People v. Stress* (1988) 205 Cal.App.3d 1259, 1275.) As Justice Cardozo explained a century ago, "'[k]nowledge that an act is forbidden by law will in most cases permit the inference of knowledge that, according to the accepted standards of mankind, it is also condemned as an offense against good morals. Obedience to the law is itself a moral duty. If, however, there is an insane delusion that God has appeared to the defendant and ordained the commission of a crime, we think it cannot be said of the offender that he knows the act to be wrong.' (*People v. Schmidt* (1915) 216 N.Y. 324, 338-340 . . . .)" (*People v. Skinner*, at pp. 783-784, fn. omitted.) This is not such a case.

Leeds's conduct was based on the legal doctrine of self-defense and the jury was required to apply it to his perception of reality in order to evaluate his sanity. The jury was instructed on self-defense but erroneously prohibited from applying it. Without applying the facts as Leeds perceived them to the law of self-defense, the jury would have no way of evaluating whether his paranoid schizophrenia rendered him incapable of appreciating the wrongfulness of his actions.

Second, the court's error was compounded when it instructed the jury that Leeds's conduct and belief must have been reasonable. It stated that self-defense applies only if the defendant "reasonably believed that he was in imminent danger of being killed," "reasonably believed that the immediate use of

11

deadly force was necessary," and "used no more force than was reasonably necessary." It further stated that Leeds's belief in imminent harm "must have been reasonable" and that he was "only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation." The unqualified emphasis on reasonableness in the context of an insanity defense allowed the jury to conclude that Leeds's beliefs, based on his hallucinations and delusions, were objectively unreasonable and did not allow him to assert he was acting in self-defense.

Accordingly, the jury here should have been instructed on self-defense modified in the context of insanity: Leeds was legally insane if, because of a mental disease or defect that he had when he committed the crimes, he actually believed that he was in imminent danger of being killed or suffering great bodily injury and that the immediate use of deadly force was necessary to defend against the danger. (See CALCRIM No. 571; *People v. Elmore*, *supra*, 59 Cal.4th at p. 140 ["A claim of . . . self-defense based solely on delusion is quintessentially a claim of insanity under the *M'Naghten* standard of inability to distinguish right from wrong. Its rationale is that mental illness caused the defendant to perceive an illusory threat, form an actual belief in the need to kill in self-defense, and act on that belief without wrongful intent"].)

The self-defense instruction did state that "[w]hen deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed." However, the phrase "the circumstances as they were known to and appeared to the defendant" refers to the objective circumstances, not the defendant's subjective perceptions based on delusions or hallucinations. (See *People v. Jefferson* (2004) 119 Cal.App.4th 508, 519 ["The issue is not whether defendant, or a person like him, had reasonable grounds for believing he

12

was in danger. The issue is whether a 'reasonable person' in defendant's situation, seeing and knowing the same facts, would be justified in believing he was in imminent danger of bodily harm. [¶] By definition, a reasonable person is not one who hears voices due to severe mental illness"].)

The sanity verdicts turned on whether Leeds actually believed he was defending himself from imminent peril, and thus could not appreciate the wrongfulness of his actions, rather than on whether his belief was reasonable in light of the objective circumstances. The trial court's instruction on self-defense, with its emphasis on reasonableness, was error.

The error was harmless, however, as to three of these decedents. While Leeds claims he believed each conspired with the others to kill him, there was no evidence that he perceived he was in imminent danger from Majan, Duboise, or Leal, and considerable evidence that he knew he was not. After shooting his father, he hunted down the other three victims, surprising them or shooting them from behind. Before he started the rampage, he called Jaquith from the safety of the back office and, by asking if Jaquith could defend him, indicated that he was already planning to kill the perceived cartel members. This was further evidenced by his call to Stevens in which he said there would be a shooting. Leeds himself told Dr. Reid, "I got a gun and went on them before they could do me in." Moreover, there was much additional evidence, such as Leeds's disconnecting the video surveillance system before the shootings, discarding his gun and outer clothing afterwards, and attempting to leave the crime scene rather than seeking out the police, all of which indicated that he knew his actions were wrongful.

We cannot say the error was harmless regarding the killing of Leeds's father because there was evidence that Leeds believed he shot him in response to an imminent lethal threat. Despite reports that he had had isolated fights with his father, several witnesses, including Leeds's stepmother and brother, testified that the two generally had a good relationship. Leeds did not

13

mention anything to Jaquith about fearing his father and, when Jaquith asked him where his father was, Leeds did not know. Leeds thought his father had agreed to kill him. When his father surprised him by kicking in the office door, Leeds immediately shot him once, and later stated that he thought his father was brandishing a gun. After shooting his father, Leeds asked a bystander to "take care of" him. In contrast, he pursued the other three victims and shot them multiple times. Even Dr. Yakush, the only expert to opine that Leeds was sane during some of the killings, thought that it was much less clear whether Leeds perceived imminent danger from his father and that he "may not have actually wanted his father to die."

The instructional error on self-defense was not harmless beyond a reasonable doubt (*Chapman v. California* (1967) 386 U.S. 18, 24), and there was a reasonable probability that without the error the jury would have found Leeds insane at the time he killed his father (*People v. Watson* (1956) 46 Cal.2d 818, 836). Thus, the verdict of sanity on that count cannot stand.

*Testimony and Instruction on the Consequences of an Insanity Verdict*

Leeds contends that the trial court denied him due process and a fair trial by allowing the jury to hear expert testimony and receive instruction on the consequences of an insanity verdict. Regarding the expert testimony, he challenges the trial court's rulings on his evidentiary objections and its denial of his request for a mistrial. In addition, he claims that the trial court improperly instructed the jury with CALCRIM No. 3450 without being requested to do so. We review the trial court's rulings on Leeds's evidentiary objections and motion for mistrial for an abuse of discretion. (*People v. Boyce* (2014) 59 Cal.4th 672, 687; *People v. Lightsey* (2012) 54 Cal.4th 668, 718.)

*Objections to Expert Testimony and Motion for Mistrial*

At trial, the prosecutor questioned the defense expert witnesses regarding Leeds's preference to go to a state mental hospital rather than prison. Dr. Rotnofsky testified that Leeds told her "that he might go to prison for the rest

14

of his life or he might go to a state hospital."  Over objection the prosecutor asked, "Did he tell you that if he is found insane he goes to a state hospital for some indeterminate period of time versus prison?"  Dr. Rotnofsky testified that Leeds made a statement to other doctors that he "could get out and be back on the streets" if he went to a state hospital.  She considered this statement in order to evaluate "potential exaggeration or malingering."

Leeds argues that the trial court erred in admitting Dr. Rotnofsky's testimony that he had told other examining doctors he might one day be released if he were found insane and sent to a mental hospital.  The purpose of Dr. Rotnofsky's testimony, like that of all the mental health experts, was to evaluate whether Leeds knew right from wrong at the time of the killings.  The major factor in their analyses was whether and to what extent he was experiencing hallucinations and delusions.  In order to assess that factor, the experts needed to determine his credibility when he reported having psychotic thoughts.  Any motive he had to lie or malinger was thus highly relevant.  His understanding that he might one day be released from a mental hospital but would never leave prison was precisely this type of motive.  Although the testimony was hearsay, "[s]uch declarations and statements, when they constitute in part the basis upon which the opinion of an expert is based, and are by [her] declared to be necessary to enable [her] to form an opinion as to the nature of the [mental] disease, are admissible."  (*People v. Shattuck* (1895) 109 Cal. 673, 678-679.)  Dr. Rotnofsky's testimony was properly admitted.  Thus, the motion for mistrial was properly denied.

Even if these evidentiary rulings had been erroneous, they did not prejudice Leeds.  At the end of the trial, the jury was instructed not to consider the consequences of an insanity finding when reaching a verdict.  Moreover, as we have discussed, there is no evidence of Leeds's legal insanity at the time he killed Leal, Duboise, and Majan, and much evidence to the contrary.  There is

15

not a reasonable probability that, but for the testimony regarding the consequences of an insanity verdict, the result would have been different.

*Propriety of CALCRIM No. 3450*

Leeds argues that the optional paragraph of CALCRIM No. 3450 on the consequences of an insanity verdict was misleading.[5] Having requested the instruction himself, however, he cannot complain about it now. "[A]n instruction on the consequences of a [not guilty by reason of insanity] verdict must be given whenever requested by the jury or defendant." (*People v. Dennis* (1985) 169 Cal.App.3d 1135, 1140.) That he requested the instruction prior to voir dire is irrelevant. Requests for jury instructions need only be made "before commencement of argument." (§ 1093.5.) The parties were discussing a "final version" of the insanity instruction, and Leeds never subsequently informed the trial court that he had a change of heart. "'When a defense attorney makes a "conscious, deliberate tactical choice" to [request or] forego a particular instruction, the invited error doctrine bars an argument on appeal that the instruction was [given or] omitted in error.' [Citations.]" (*People v. McKinnon* (2011) 52 Cal.4th 610, 675.)

---

[5] The relevant paragraph of CALCRIM No. 3450 provides as follows: "If you find the defendant was legally insane at the time of (his/her) crime[s], (he/she) will not be released from custody until a court finds (he/she) qualifies for release under California law. Until that time (he/she) will remain in a mental hospital or outpatient treatment program, if appropriate. (He/She) may not, generally, be kept in a mental hospital or outpatient program longer than the maximum sentence available for (his/her) crime[s]. If the state requests additional confinement beyond the maximum sentence, the defendant will be entitled to a new sanity trial before a new jury. Your job is only to decide whether the defendant was legally sane or insane at the time of the crime[s]. You must not speculate as to whether (he/she) is currently sane or may be found sane in the future. You must not let any consideration about where the defendant may be confined, or for how long, affect your decision in any way."

16

*Elimination of Questions from the Jury Questionnaires*

Leeds contends that the trial court denied him due process and a fair trial when, over his objections, it eliminated questions from the juror questionnaires after they revealed too much bias among the jury pool. We review the trial court's procedure for questioning prospective jurors for abuse of discretion and will not reverse absent a miscarriage of justice. (Code Civ. Proc., § 223; *People v. Tafoya* (2007) 42 Cal.4th 147, 168.) "Discretion is abused when the questioning is not reasonably sufficient to test prospective jurors for bias or partiality." (*People v. Tafoya*, *supra*, at p. 168.)

During jury selection, the first panel of prospective jurors completed a 20-page juror questionnaire containing 57 questions. Based on the responses to the questionnaire, defense counsel challenged "quite a few" prospective jurors for cause.[6] In the end, the trial court dismissed the entire panel. Notwithstanding defense counsel's "encourag[ing] the court to maintain the current questionnaire," the court subsequently used a generic, 5-page questionnaire containing 11 questions, none of which pertained to the prospective jurors' knowledge of or feelings about case-specific issues.

Leeds argues that "the trial court's decision to change the selection process to eliminate the candid expression of the potential jurors' views constituted an abuse of discretion rising to a violation of due process." "'"The Constitution . . . does not dictate a catechism for *voir dire*, but only that the defendant be afforded an impartial jury."' [Citation.] '[T]he trial court is given wide latitude to determine how best to conduct the voir dire . . . .' [Citation.]

---

[6] The original questionnaire asked several broad, open-ended questions such as "What is your opinion of psychologists and psychiatrists in general?" and "Do you have any strong beliefs about the use of forensic psychiatry in criminal cases? . . . If so, please describe." Several prospective jurors responded with comments reflecting bias, such as, "I wouldn't want the accused to come after me if he was released" and "[I] wouldn't believe anything that a psychiatrist would say. . . . [Leeds] killed four people and he should do the time."

17

Whether the prospective jurors are required to complete a written questionnaire is a matter within the trial court's discretion. [Citation.]" (*People v. Tafoya*, *supra*, 42 Cal.4th at p. 168.)

Here, the trial court concluded that the original questionnaire was impractical because it forced prospective jurors to respond to legal issues on which they had not yet been instructed and its numerous open-ended questions encouraged jurors to lie to get out of jury duty. This was not an abuse of discretion. The attorneys were given great latitude in orally questioning prospective jurors so that they could inquire about any of the information that the original questionnaire was intended to elicit. In addition, the attorneys were permitted to question prospective jurors in chambers if there were issues they did not feel comfortable discussing in the courtroom. Leeds identifies no instance where defense counsel's opportunity to examine a prospective juror was inadequate.

The cases upon which he relies, *Skilling v. United States* (2010) 561 U.S. 358 and *Irvin v. Dowd* (1961) 366 U.S. 717, do not help him. In *Skilling*, the defendant argued that "the *voir dire* [was] insufficient because . . . jury selection lasted 'just five hours,' [and] '[m]ost of the court's questions were conclusory[,] high-level, and failed adequately to probe jurors' true feelings." (*Skilling*, *supra*, at p. 387.) Emphasizing that "[j]ury selection . . . is 'particularly within the province of the trial judge,'" the Court rejected Skilling's challenge on the ground that the trial court had "initially screened venire members by eliciting their responses to a comprehensive questionnaire" that he had "drafted in large part." (*Id.*, at pp. 386, 388.) In *Skilling*, as here, the overall process was fair. The only difference was its sequence: here, the trial court provided a short jury questionnaire and later allowed comprehensive questioning; in *Skilling*, the trial court provided a comprehensive questionnaire and subsequent questioning was relatively brief.

18

*Irvin*, which involved the trial court's denial of a motion to change venue in the face of strong local prejudice against the defendant, is inapposite. Leeds did not move to change venue and does not now claim that a fair trial in Santa Maria would have been impossible. He merely contends that the process used to select the jury was inadequate. As we have explained, that contention lacks merit.

*Cumulative Error*

Leeds also contends that cumulative error warrants reversal. As we have identified only one error, there is nothing to cumulate. (See *People v. Myles* (2012) 53 Cal.4th 1181, 1225.)

DISPOSITION

The judgment is reversed in part and this matter is remanded for a new sanity trial regarding the killing of Leeds's father. In all other respects, the judgment is affirmed.

<u>CERTIFIED FOR PUBLICATION.</u>

PERREN, J.

We concur:

GILBERT, P. J.

YEGAN, J.

19

Edward H. Bullard, Judge

Superior Court County of Santa Barbara
_____

Jean Matulis, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Senior Assistant Attorney General, Shawn McGahey Webb, Supervising Deputy Attorney General, Gary A. Lieberman, Deputy Attorney General, for Plaintiff and Respondent.