Filed 9/29/16  P. v. Macias CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RAYMOND DANIEL MACIAS,<br><br>    Defendant and Appellant. | 2d Crim. No. B260191<br>(Super. Ct. No. 1434130)<br>(Santa Barbara County) |

A jury convicted Raymond Daniel Macias of torture (Pen. Code, § 206)[1] and sale of methamphetamine (Health & Saf. Code, § 11379, subd. (a)), but could not reach a verdict on a charge of kidnapping for extortion (§ 209, subd. (a)).  He was retried on that count, and the second jury convicted him.[2]  Both juries found criminal street gang and firearms use allegations to be true.  (§§ 186.22, subd. (b)(1)(4), 12022.53, subds. (b), (e).)  He was sentenced to state prison for 18 years plus life without the possibility of parole.

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

[2] In addition, Macias was charged with solicitation of extortion (§ 653f, subd. (a)) involving a different victim than the other three counts.  This count was dismissed (§ 1385) after the first jury failed to reach a verdict.

Macias contends that the trial court erred by instructing that he could be convicted of kidnapping for extortion as an aider and abettor or coconspirator under the "natural and probable consequences" doctrine and that there is insufficient evidence to support the gang enhancements. We affirm.

FACTS[3]

*Sureño Gang Structure*

Hispanic criminal street gangs in California are divided into two main groups. In the south, including all of Santa Barbara County, Sureño gangs work for the Mexican Mafia—a group of approximately 200 members, most of whom are serving life sentences in prison. In the north, Norteño gangs work for the Mexican Mafia's rival, Nuestra Familia.

The Mexican Mafia's ultimate goal is to make money. It does this by controlling territory using the hundreds of thousands of Sureño-affiliated street gang members. It imposes "taxes" on Sureño gangs: a "cut" of any money made from drug dealing, car stealing, prostitution, and other illegal activity in exchange for "respect" and "protection." Each Mexican Mafia member controls a particular county and is entitled to the taxes from that county.[4] He establishes a crew chief for the county who "takes care of . . . tax-collecting, assaults, [and] whatever business needs to be taken care of to keep the money flowing." The crew chief typically does not perform these functions himself; he has his crew do them.

The Mexican Mafia imposes rules on Sureño gangs. The most important rule is no cooperation with law enforcement because that keeps the "homies" out of

---

[3] We summarized the facts from Macias's first trial in *People v. Almanza* (March 3, 2016, B258565 [nonpub.opn.]) and here summarize the relevant facts from his second trial. We discuss evidence from his first trial regarding the gang enhancement below. Respondent's request to take judicial notice of our opinion in Case No. B258565 is granted.

[4] Larger counties, such as Los Angeles County, may be controlled by several Mexican Mafia members, each running a particular neighborhood.

prison and enables the gang to continue conducting its business and sending money to the Mexican Mafia.  Other rules include no drive-by shootings and no "gang bang[ing]" on another member in the presence of his family.  The Mexican Mafia disseminates these rules from its "headquarters" in Pelican Bay State Prison, where many of its members are housed, to the other prisons, the county jails, and the streets.

When a gang member commits an infraction of the rules, he gets "checked"—other gang members inflict pain ranging from a beating to a stabbing—as a punishment.  If a gang member talks to the police, he is "green-lit," meaning he becomes a target whom any other gang member should hurt or kill.  The gang's "shot caller" decides the appropriate punishment and need not personally participate in administering it.

A Sureño gang has different levels of membership:  "hang-arounds" who aspire to be members; "associates" who "put[] in work," i.e., commit crimes on the gang's behalf; "members" who have been formally "jumped-in" and have committed themselves to the gang; and "shot callers," the "hard-core" members who have been to prison and have started to learn the ways of the Mexican Mafia.  Within a gang there may be multiple subgroups or cliques that form out of generational differences or school ties.

There is a difference in prison between being a member of a Sureño street gang and being a Sureño.  All Sureño street gang members are expected to participate in prison riots on behalf of the Sureños but some are "just there to do their time."  Sureños are fully committed to the Mexican Mafia and serve as their front-line "soldiers" in prison.  They must carry a weapon and be ready to handle "whatever situation" arises with Norteños, members of non-Hispanic gangs, or anyone else.  A Sureño "learn[s] the ropes of how [you] conduct [yourself], what's right and what's wrong, how to discipline people . . . , and how to take that position of power that you have."  If a Sureño puts in enough work and obtains the "blessings" of three Mexican Mafia members who vouch for him, he is invited "to become part of the family," i.e., the Mexican Mafia.

3

Sureños in prison follow additional rules designed to increase the number and strength of Mexican Mafia soldiers, such as working out five days a week for an hour and not fighting with other Sureños. Outside of prison, Sureño gangs from different neighborhoods can be rivals, but inside they must "join forces to represent the South . . . for the Mexican Mafia." Sureños from the same county "watch over each other" in prison and "check each other's paperwork" to "mak[e] sure everything's cool" with their reported criminal history.[5]

*The Structure Applied*

Macias was a Sureño and a member of the Krazies clique of the East Side Santa Barbara gang. He was the crew chief of Santa Barbara County for approximately three years beginning in the summer of 2010. He reported to Michael Moreno, the Mexican Mafia member who controlled Santa Barbara County. Macias collected taxes for Moreno and made payments to him twice a month. Stephen Mendibles was a member of the West Side clique of Vario Lamparas Primero (VLP), a Sureño gang in Lompoc. For a time, Mendibles collected taxes in Lompoc and made payments to Macias.

*The Instant Offenses*

During Macias's tenure as Santa Barbara County crew chief, the person responsible for collecting taxes in Lompoc and "moving the money up the ladder" was often arrested or killed. Due to the constant turnover, the Mexican Mafia was having trouble getting its money from Lompoc.

Macias put Mendibles in charge of tax collection in Lompoc in 2012. Mendibles paid taxes on time at first but later fell behind. At some point he stopped paying taxes altogether and "went missing." He owed Macias around $1,200 in unpaid taxes and for drugs that he had been fronted to sell.

Macias told Juan Zavala, his driver and "right-hand man," and Luis Almanza, his codefendant in the first trial, to find Mendibles "by any means necessary"

---

[5] Sureños verify whether a member is "no good, or a rat, or whatever" by examining court documents and police reports.

because Mendibles "had something coming." In January 2013, Mendibles called his cousin, Philip Lopez, who was at Almanza's residence in Lompoc. Lopez told Mendibles that Macias wanted to talk to him. Mendibles said, "All right. Give me 30 minutes and then you come pick me up."

Lopez told Almanza about the call. Almanza told Gabriel Luna, who had a handgun, to go with him. Lopez, his two brothers, and Luna left to pick up Mendibles at the apartment where he was waiting. When they arrived, Mendibles appeared to be "stalling." According to Lopez, Mendibles "was trying to make up excuses, saying that he couldn't go right now, that he's waiting for somebody to come give him some dope so he could re-up to pay . . . Macias." Lopez told Mendibles, "Let's just go talk to him real quick [and] get this over with." Mendibles said, "Okay." He expected that he "was going to get a beat-down real quick and talk to [Macias] about it, and that was it."

They returned to Almanza's residence and, as Almanza had instructed, brought Mendibles into the garage. Almanza said to him, "You. In the fucking middle." Mendibles stepped towards Almanza, who swung his fist at him and missed. Mendibles grabbed Almanza's torso and threw him to the ground. Luna, holding the gun, told Lopez and one of his brothers, "'Get that fool.'" Lopez and his brother punched Mendibles from behind. Almanza struck Mendibles twice with the flat end of an axe. The first blow landed on his elbow. When Almanza swung a second time, Mendibles raised his arm to block his face and was struck in his armpit.

Almanza told Lopez and Luna, "'Get all his shit,'" and they took Mendibles's wallet, shoes, jacket, phone, necklace, Rolex watch, and iPod. Almanza then had them bind Mendibles's hands and feet and place duct tape over his mouth. They forced him to sit on a milk crate and placed a plastic tarp underneath it. Almanza told him, "'We'll make your ass fucking squeal. You're fucking done.'"

About two hours later, Macias and Zavala walked into the garage. Macias said to Mendibles, "'Damn, dog. You know I hate to see you like this. . . . But you know if you fuck with my money, shit like this happens . . . .'" Macias and Zavala went outside to speak in private. Zavala said, "'we're going to let him go, right?'" Macias, who "had

5

the last say" in the matter, said, "Yeah." Macias decided that Mendibles would have to pay the entire amount that he owed in three or four days and would have to be stabbed as punishment.

Macias had Almanza remove the duct tape from Mendibles's mouth. Macias said to Mendibles, "'So what's up? Are you going to be able to get my money or not? . . . Can we work something out?'" Mendibles told Macias, "'I can get you half of it right now, and in a couple weeks, I can call you and we can work something out, but . . . [y]eah, I can get you your money.'" Mendibles knew this was not true. Macias agreed to let Mendibles pay the money in two installments—half in a few days and the rest in two weeks. Macias also told him that he would "have to get stabbed [by Lopez] a couple of times" in a few days.

Mendibles was untied and given back his clothes. Luna kept his watch, necklace, iPod, and the $40 in his wallet. One of Mendibles's cousins drove him back to where he was staying. He "laid low," "trying to hide" from Macias and the police. He "had warrants out for [his] arrest" for probation or parole violations. Eventually, the police caught up with him and took him into custody.

DISCUSSION

*Instruction on Natural and Probable Consequences Doctrine*[6]

Macias contends that the trial court erred by instructing the jury that he could be guilty of kidnapping for extortion as an aider and abettor or coconspirator under the "natural and probable consequences" doctrine. We review the propriety of jury instructions de novo. (*People v. Leeds* (2015) 240 Cal.App.4th 822, 830.)

The trial court instructed the jury that "[a] person may be guilty of a crime in more than one way." The court explained that Macias could be directly liable as a perpetrator or an aider and abettor. It then explained how he could be found guilty under a natural and probable consequences theory if he committed any one of three target offenses: "[T]he People must prove that: One, the defendant is guilty of extortion or

---

[6] Our discussion of this issue relates to Macias's second trial only.

assault with a deadly weapon or simple battery; two, during the commission of extortion or assault with a deadly weapon or simple battery, a co-participant in that extortion or assault with a deadly weapon or simple battery committed the crime of kidnapping for extortion; and, three, under all of the circumstances, a reasonable person in the defendant's position would have known that the commission of the kidnapping for extortion was a natural and probable consequence of the commission of the extortion or assault with a deadly weapon or simple battery." (See CALCRIM Nos. 402 & 403.)[7]

The trial court similarly instructed on liability as a coconspirator of an uncharged conspiracy: "A member of a conspiracy is criminally responsible for the crimes that he conspires to commit no matter which member of the conspiracy commits the crime. [¶] A member of a conspiracy is also criminally responsible for any act of any member of the conspiracy if that act is done to further the conspiracy and that act is a natural and probable consequence of the common plan or design of the conspiracy. This rule applies even if the act was not intended as part of the original plan. Under this rule, a defendant, who is a member of the conspiracy, does not need to be present at the time of the act. [¶] . . . [¶] To prove that the defendant is guilty of the crime charged in Count 1 [kidnapping for extortion], the People must prove that: One, the defendant conspired to commit one of the following crimes: Extortion, or assault with a deadly weapon, or simple battery; two, a member of the conspiracy committed kidnapping for extortion to further the conspiracy; and, three, kidnapping for extortion was a natural and probable consequence of the common plan or design of the crime that the defendant conspired to commit." (See CALCRIM No. 417.)

---

[7] Although the trial court purportedly used CALCRIM No. 402, the appropriate instruction was the alternative CALCRIM No. 403 as Macias was charged only with kidnapping for extortion, a non-target offense. The court actually delivered a modified version of CALCRIM No. 402 that more closely resembled CALCRIM No. 403. In particular, the court omitted the sentence found only in CALCRIM No. 402 that "[u]nder certain circumstances, a person who is guilty of one crime may also be guilty of other crimes that were committed at the same time." The error was harmless.

In addition to the usual definitions of "natural and probable consequence,"[8] the trial court delivered a special instruction that further defined the term: "A natural and probable consequence is one that is reasonably foreseeable. To be reasonably foreseeable, the consequence need not have been a strong probability. A possible consequence which might reasonably have been contemplated is enough. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence." (Accord, *People v. Medina* (2009) 46 Cal.4th 913, 920.)

Macias argues that the trial court should not have instructed that he could be found guilty as an aider and abettor or a coconspirator of one of the target offenses under the natural and probable consequences doctrine. Relying primarily on *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*), he asserts that "the connection between [his] culpability and the perpetrator's mental state is too attenuated to impose [vicarious] liability for kidnapping for extortion under the natural and consequences doctrine, especially in light of the severe penalty involved and the public policy concern of deterrence."

*Chiu*, however, did not hold that a defendant who intended to commit a relatively minor crime—there the target offenses were assault and disturbing the peace (*Chiu*, *supra*, 59 Cal.4th at p. 158)—could not be guilty of second degree murder, a crime with a much greater punishment and mens rea. Rather, the Supreme Court held "that an

_____

[8] (See CALCRIM No. 402 ["A *natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence"]; accord, CALCRIM No. 417.) The trial court also delivered a portion of CALCRIM No. 402 in use at the time: "If the [kidnapping for extortion] was committed for a reason independent of the common plan to commit the [extortion or assault with a deadly weapon or simple battery], then the commission of [kidnapping for extortion] was not a natural and probable consequence of [extortion or assault with a deadly weapon or simple battery]." (CALCRIM No. 402 (2014).) The California Supreme Court subsequently held that this language "does not correctly state the law of aider and abettor liability," being "unduly favorable to [the] defendant." (*People v. Smith* (2014) 60 Cal.4th 603, 617.) The current versions of CALCRIM Nos. 402 and 403 do not include it.

aider and abettor may not be convicted of first degree *premeditated* murder under the natural and probable consequences doctrine" and that "his or her liability for that crime must be based on direct aiding and abetting principles. [Citation.]"[9] (*Id.* at pp. 158-159.) This is because the "mental state [of first degree murder] is *uniquely* subjective and personal." (*Id.* at p. 166, italics added.) While all murder requires malice aforethought, "[f]irst degree murder . . . has the additional elements of willfulness, premeditation, and deliberation which trigger a heightened penalty. [Citation.]" (*Ibid.*)

Macias cites a "line of cases on the nature of derivative aider and abettor culpability under the natural and probable consequences doctrine." He argues that these cases "illuminate[] the developing recognition in the jurisprudence that the indirect aider and abettor's culpability is dependent on that individual's separate mens rea and is relevant to the determination of that individual's culpability." To the contrary, "'aider and abettor culpability under the natural and probable consequences doctrine . . . is not premised upon the intention of the aider and abettor to commit the nontarget offense. . . . Because the nontarget offense is unintended, the mens rea of the aider and abettor with respect to that offense is irrelevant and culpability is imposed simply because a reasonable person could have foreseen the commission of the nontarget crime. [Citation.]" (*Chiu*, *supra*, 59 Cal.4th at p. 164.) "The natural and probable consequences doctrine is based on the principle that liability extends to reach 'the actual, rather than the planned or "intended" crime, committed on the *policy* [that] . . . aiders and abettors should be responsible for the criminal *harms* they have naturally, probably, and foreseeably put in motion.' [Citations.]" (*Ibid.*)

The Supreme Court's reasoning in *Chiu* was strictly limited to the context of first degree murder. Extending it, as Macias urges, to any crime where "the

_____

[9] In *People v. Rivera* (2015) 234 Cal.App.4th 1350, the Court of Appeal held that the analysis in *Chiu* precluded a coconspirator in an uncharged conspiracy from being held liable for first degree murder under the natural and probable consequences doctrine. Following *Rivera*, we assume the analysis of vicarious liability here is the same for coconspirators as for aiders and abettors.

9

connection between [the defendant's] culpability and the perpetrator's mens rea is . . . 'too attenuated'"—an impossibly vague standard—would render the natural and probable consequences doctrine a nullity. We decline to do so. The instruction on theories of vicarious liability under the natural and probable consequences doctrine was proper.

### Sufficiency of the Gang Enhancement Evidence

Macias contends that the evidence fails to support the gang enhancements. "When the sufficiency of the evidence to support a conviction is challenged on appeal, we review the entire record in the light most favorable to the judgment to determine whether it contains evidence that is reasonable, credible, and of solid value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] 'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' [Citation.] Unless it describes facts or events that are physically impossible or inherently improbable, the testimony of a single witness is sufficient to support a conviction. [Citation.]" (*People v. Elliott* (2012) 53 Cal.4th 535, 585.) The substantial evidence standard also applies to gang enhancement findings. (*People v. Villalobos* (2006) 145 Cal.App.4th 310, 321-322.)

The gang enhancement requires proof that the defendant committed the felony "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." (§ 186.22, subd. (b)(1).) A criminal street gang must have members who "individually or collectively engage in or have engaged in a pattern of criminal gang activity." (§ 186.22, subd. (f).) As relevant here, a "pattern of criminal gang activity" is defined as "the . . . conviction of two or more [enumerated] offenses, provided at least one of these offenses occurred after [September 26, 1988] and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons." (§ 186.22, subd. (e).) To show the predicate offenses that established a "pattern of criminal activity," the People in

10

both trials presented evidence of convictions of several individuals from Sureño-affiliated gangs in Santa Barbara County.

In *People v. Prunty* (2015) 62 Cal.4th 59 (*Prunty*), the Supreme Court held that "when the prosecution seeks to prove the street gang enhancement by showing a defendant committed a felony to benefit a given gang, but establishes the commission of the required predicate offenses with evidence of crimes committed by members of the gang's alleged subsets, it must prove a connection between the gang and the subsets." (*Id.* at pp. 67-68.) Relying on *Prunty*, Macias argues that "the prosecution presented evidence of the criminal activities of members of several alleged [Sureño] subsets" but "failed to present sufficient evidence that the group [he] acted to benefit, i.e., the Sureno gang . . . , and the group who committed the predicate offenses [are] one and the same." We disagree.

In both trials, there was overwhelming evidence that the Sureño-affiliated gangs in Santa Barbara County were "part of a loose approximation of a hierarchy" with "shared bylaws or organizational arrangements" and were "controlled by the same locus or hub." (*Prunty*, *supra*, 62 Cal.4th at p. 77.) Officer Scott Casey, the gang expert, testified that all Hispanic street gangs in Santa Barbara County are controlled by the Mexican Mafia through its Sureño soldiers. He further testified that gang members follow rules, in particular the taxes on drug sales that are required to be paid, designed to keep money flowing to the Mexican Mafia. "Subsets may . . . be linked together as a single 'criminal street gang' if their independent activities benefit the same (presumably higher ranking) individual or group. An example would be various [Sureño] subset gangs that share a cut of drug sale proceeds with the same members of the [Mexican Mafia] prison gang." (*Ibid.*)

One of the predicate offenses was committed by Alejandro Carrillo, who was a Sureño from Guadalupe. On orders from Macias's predecessor, the former crew chief in charge of Santa Barbara County for the Mexican Mafia, Carrillo murdered a drug dealer who was supplying the Sureños with less than the agreed-upon amount of

11

narcotics. Carrillo and Macias were both part of the same hierarchy and their offenses benefitted the same higher-up group.

Another predicate offense was committed by Michael Regalado, who, like Macias, was both a Sureño and a member of Krazies clique of the East Side Santa Barbara gang. At Macias's direction, Regalado and Adam Ybarra, a member of a different Sureño gang, the West Side VLP, "work[ed] together as a team" to run the Santa Barbara jail. Ybarra served as Regalado's "second-in-command." They sent the money they collected to Macias. "[P]roof that members of two gang subsets 'hang out together' and 'back up each other,' can help demonstrate that the subsets' members have exchanged strategic information or otherwise taken part in the kinds of common activities that imply the existence of a genuinely shared venture. [Citations.]" (*Prunty*, *supra*, 62 Cal.4th at p. 78.) The evidence at each trial was sufficient to support the gang enhancements.

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.


PERREN, J.


We concur:


GILBERT, P. J.


YEGAN, J.


12

Patricia L. Kelly, Judge

Superior Court County of Santa Barbara

_____


Janyce Keiko Imata Blair, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Shawn McGahey Webb, Supervising Deputy Attorney General, and Gary A. Lieberman, Deputy Attorney General, for Plaintiff and Respondent.