Filed 2/2/21  P. v. Hughes CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B299683 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA071692) |
| v. | |
| WILLIAM FRANKLIN HUGHES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Charles A. Chung, Judge.  Affirmed and remanded with directions.

Elizabeth K. Horowitz, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey,

Senior Assistant Attorney General, Steven D. Matthews and David F. Glassman, Deputy Attorneys General, for Plaintiff and Respondent.

---

## INTRODUCTION

Appellant William Franklin Hughes fatally strangled repairperson Lyndi Fisher when, for a second time, she visited his house to repair his refrigerator. Charged with Fisher's premeditated murder, he entered pleas of not guilty and not guilty by reason of insanity, resulting in the bifurcation of his trial into guilt and sanity phases. At the guilt phase, over appellant's objection, the trial court admitted evidence of an incident in which, several weeks before Fisher's killing, appellant made sexual advances to a fellow college student at their school. Relying on this evidence, the prosecution suggested that Fisher's rejection of a sexual advance by appellant might have motivated him to kill her, but further argued such motivation was immaterial, in light of compelling evidence that appellant had been the initial aggressor, that he had battered Fisher to overcome her resistance, and that he had crushed her neck for 90 seconds or more. Defense counsel, pointing to evidence that appellant had a psychotic illness that caused paranoid delusions, suggested appellant had been motivated by a delusion that Fisher was planting or retrieving a surveillance device in the refrigerator. Relying on evidence

of such delusions, defense counsel argued appellant had acted in "imperfect" self-defense.

Also at the guilt phase, appellant's father testified that several weeks before Fisher's killing, appellant had reported an armed intruder in his house. Appellant's father believed the motive for this prior report of an intruder was appellant's desire to avoid blame for creating a mess in his house. The jury heard recordings of false statements appellant had made to detectives shortly after Fisher's killing, including the claim that at the insistence of an armed intruder, he had been taking a 45-minute walk around the neighborhood at the time of the killing. Without objection, the court delivered both CALCRIM No. 362 (allowing the jury to infer appellant's consciousness of guilt from any knowingly false pretrial statements he had made related to the offense) and CALCRIM No. 3428 (prohibiting the jury from considering evidence of appellant's mental illness for any purpose other than determining his mental state at the time of the offense). Appellant did not testify.

The jury convicted appellant of Fisher's murder, finding it to be premeditated and deliberate. At the sanity phase, tried to the court, the guilt-phase evidence was admitted into the record, along with additional expert evidence. Only one expert, whom the court found the least helpful, opined that appellant had been unable to understand the moral wrongfulness of killing Fisher (the only theory of insanity advanced by appellant). Again, appellant did not testify. The court found appellant had

failed to prove insanity by a preponderance of the evidence. At sentencing, defense counsel made an oral *Romero* motion to strike a charged three-strikes enhancement (which the court denied), but did not ask the court to strike a charged serious-felony enhancement.[1]  The court sentenced appellant to an aggregate term of 55 years to life, comprising a 25-years-to-life term on the first degree murder conviction (doubled under the three strikes law) and a five-year term on the serious-felony enhancement.

On appeal, appellant challenges the guilty verdict on the grounds that:  (1) no substantial evidence supported the jury's finding of premeditation and deliberation; (2) the trial court prejudicially erred by admitting the evidence of appellant's sexual advances on his fellow student; (3) the court prejudicially erred by failing to modify CALCRIM No. 3428 to permit the jury to consider evidence of appellant's mental illness in deciding whether his false pretrial statements to the detectives were *knowingly* false, as necessary to support an inference of consciousness of guilt; (4) many of the prosecutors' remarks during closing argument constituted misconduct; and (5) his trial counsel were ineffective for failing to object to the admission of testimony from appellant's father regarding appellant's motive for reporting an intruder several weeks before Fisher's killing.  Appellant also challenges the sanity verdict, contending the trial court misapplied the law by relying on

---

[1]      *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

4

its personal belief that finding appellant sane was necessary to deliver justice to Fisher's family, and asserting that the court erred in various ways in describing and weighing the sanity-phase evidence.  We construe appellant's assertion of the latter errors as a contention that no substantial evidence supported the sanity verdict under the proper legal standard.  Finally, appellant challenges his sentence on the ground that his trial counsel were ineffective for failing to ask the court to exercise its discretion, under Senate Bill No. 1393 (Stats. 2018, ch. 1013, §§ 1-2), to strike his serious-felony enhancement.  The People do not argue defense counsel had a conceivable tactical purpose for failing to request the striking of the serious-felony enhancement.

Though we find the admission of certain evidence erroneous, we find no reversible error at the guilt or sanity phases of appellant's trial.  We do conclude that defense counsel's failure to request the striking of the serious-felony enhancement deprived appellant of effective assistance at sentencing.  Accordingly, we affirm the judgment, and remand to the trial court with instructions to decide whether to exercise its discretion to strike the serious-felony enhancement.

## PROCEEDINGS BELOW

### A. *Prosecution Case*

The People charged appellant with Fisher's willful, premeditated, and deliberate murder (Pen. Code, §§ 187, subd. (a), 189, subd. (a)).  The People alleged that appellant

had been convicted in 2013 of making criminal threats (*id.*, § 422), and that this prior conviction was both a strike within the meaning of the three strikes law (*id.*, §§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)) and a serious felony within the meaning of Penal Code section 667, subdivision (a).

Appellant entered pleas of not guilty and not guilty by reason of insanity. Accordingly, his trial was bifurcated into a guilt phase (tried to a jury) and a sanity phase (tried to the court). (See Pen. Code, § 1026, subd. (a).) We summarize the sanity phase in a later subsection of this opinion.

### 1. *Fisher's Repair Visits*

In June 2017, appellant was living alone in a house his parents had bought for him. Appellant's father testified that around that time, appellant reported that his refrigerator was not keeping food cold, so his father examined it and discovered a broken gasket. Appellant admitted he had slashed the gasket because he thought "somebody was putting radio transmitters in there" to spy on him. Appellant's father replaced the gasket, but the door was not fully closing, so he asked his wife to place a repair order with Arrow Appliance.

Fisher was then working for Arrow Appliance. On June 17, 2017, Fisher visited appellant's house and worked on his refrigerator. Appellant and his mother were present. Unable to complete the repair, Fisher ordered parts to be used on a return visit.

Fisher returned to appellant's house in her company truck on July 14, 2017, at 6:09 p.m., as confirmed by a tracking device installed on her truck. Fisher's employer, Carol Savoie, testified that Fisher sent her a text message minutes before her arrival at appellant's house, but Fisher failed to respond to a series of text messages Savoie sent between 6:45 p.m. and 8:30 p.m., even though Fisher was supposed to pick up her paycheck from Savoie that evening. She further testified that the tracking device confirmed that someone started the truck's engine at 8:50 p.m., but turned it off within a minute, without moving the truck.

One of appellant's neighbors testified that around 9:00 p.m. the same evening, she left her home and saw appellant walking from his yard to Fisher's truck, briefly looking inside it, and entering his garage through the open garage door, which he then closed. Savoie testified she drove to Fisher's truck (located by the tracking device) around 9:30 p.m., found no sign of Fisher inside other than her personal cell phone and tools, and saw appellant standing outside his house. She left without interacting with appellant.

### 2. *Discovery of Fisher's Battered Body*

Around 11:30 p.m. on the night of Fisher's second repair visit, Los Angeles County Sheriff's Department Deputy Kenneth Towles responded to a 911 call from appellant. Appellant silently directed him to the garage, where he found Fisher's body on the floor. He also found clothing in the washing machine, which was running when

7

he arrived.  A photograph of two "painter shifts" found in appellant's washing machine was admitted into evidence.

A medical examiner conducted an autopsy on Fisher and opined that her cause of death was manual strangulation.  He testified that she had hemorrhages in the interior muscles of her neck, indicating that sufficient pressure had been applied to block her carotid arteries, which carry blood to the brain.  He further testified that in general, blockage of the carotid arteries will not render the victim unconscious until after 90 seconds.  After 90 seconds, the brain will be "on its way towards death" if oxygen is not restored.

The medical examiner also identified dozens of bruises and abrasions on Fisher's body.  Fisher had half a dozen in the area of her neck (including her lower jaw and sternocleidomastoid muscle).  She had seven in the area of her eyes, nose, and inner lip.  She had numerous bruises and abrasions on her forehead, chin, and cheek.  Additionally, she had bruises and abrasions on both legs and on her groin.  Finally, she had over a dozen bruises on her arms, and abrasions and bruises on her hands.

The examiner testified that Fisher's forearm injuries were "defensive-type" injuries, suggesting she had sustained them while "trying to block any kind of blow to her head or chest."  He further testified the injuries to her hands were "assault-type" injuries, suggesting she had punched her assailant.  Appellant's DNA was found on Fisher's forearms and under the fingernails of her left hand.

### 3. *Appellant's Interviews with Detectives*

Deputy Towles testified that appellant's behavior at the crime scene appeared "odd," explaining, "[H]e displayed very little emotion. He didn't seem concerned that he had just found a dead body in his garage. His answers to many basic questions were short, or 'I don't know' or 'I guess.' Little things like that." Appellant's face and hands were extremely sweaty. Deputy Towles arranged for appellant to be interviewed by Detectives Kasey Woodruff and Karen Shonka at a police station, where appellant was advised of his *Miranda* rights. The detectives conducted two recorded interviews of appellant, both of which were played for the jury.

The detectives first interviewed appellant at 5:45 a.m. on the morning after the killing. (July 15, 2017). Appellant told the detectives that after Fisher arrived and began working on his refrigerator, he merely sat on the couch until a large, dark-skinned intruder wearing dark clothes and gloves -- whom he could not otherwise describe -- came through the door and pressed a gun against his eye. The detectives observed appellant had a black eye or similar mark. Appellant further claimed the intruder commanded him, at gunpoint, to take a walk. Appellant complied by taking a 45-minute walk around his neighborhood before returning home; he described his route to the detectives. He found himself alone in the house, and spent two hours there before finding Fisher's body in the garage, even though Fisher's truck remained parked in front. He claimed not to

know what had happened to her.  He acknowledged he was responsible for the clothing being washed when the police arrived.  After concluding the interview, Detective Woodruff viewed footage from a camera located along the route appellant claimed to have walked, which contradicted appellant's claim.

Several hours after the first interview (around 11:15 a.m. on July 15, 2017), the detectives interviewed appellant again.  Despite being informed that the camera footage had contradicted his claim to have walked his specified route, appellant repeated his account of the intruder and his walk around the neighborhood.  Detective Woodruff told appellant the detectives knew what happened, but did not know "why, the reason."  Appellant responded, "The reason, the reason . . . .  It's interesting."  When asked what the reason was, appellant responded, "Well, the reason implicates me, or --"  When asked how it implicated him, appellant responded, "It makes me guilty of a crime eventually."  He then denied that he could tell the detectives why Fisher died, and, when pressed, reiterated his claim to have left the house before she died.[2]

_____

[2]    According to evidence admitted only at the sanity phase, appellant initiated a third interview with the detectives several hours after the second.  During this interview, appellant stated that "a mental illness thing" had brought about Fisher's killing, which he characterized as an "instinctual move" to protect his and his parents' lives.  Appellant identified no basis for this alleged belief.

### 4. *Appellant's Prior Report of an Intruder*

In May 2017, appellant moved into the house his parents had bought for him. On a date soon thereafter, appellant told his father that earlier that day, a man had entered his house, forced him into a closet at gunpoint, and ransacked the house. Appellant said he had called 911, but the police had not responded to the call. Appellant's father went with appellant to the sheriff's department, where he discovered that appellant's neighbor had made a 911 call, at appellant's request, earlier that day. The neighbor had reported appellant's claim about the intruder, but had called again an hour later and suggested "something [was] wrong with" appellant and appellant might "have autism." As a result of this second call, the department had not responded to appellant's house. At appellant's father's insistence, the department sent officers to the house.

Appellant's father also went to the house. He testified, "I didn't think it had been ransacked because there were areas, targeted areas that had been disturbed, like a dresser moved or pill bottles, prescription medicine strewn across the kitchen." It did not seem to him that there had been an intruder. Without objection, he testified, "I thought he got mad, knocked all of his stuff around. Didn't want to have to explain to his mother why he had messed up this beautiful new house he just moved into. And told a story."

On cross-examination, appellant's counsel elicited testimony concerning appellant's long history of mental illness and drug abuse. Appellant's father testified that he

11

had not known appellant to have any drug abuse problem since appellant completed a rehab program in 2015. But appellant had continued experiencing paranoia between his completion of rehab and Fisher's killing. About five or six times, appellant had thrown his phone on the ground and stomped on it due to concerns about the phone's connection to the cloud.[3] After appellant moved into the house in which he killed Fisher, he told his father that he was hearing things, such as a person trying to cut a hole in the roof. Appellant glued shut the panel granting access to and from the attic, and slept with a "samurai sword." He "mentioned a lot of things" about people, including white supremacists, being "out to get him and his family." His father found knives hidden atop picture frames in the house.

### 5. *Appellant's Prior Assertion of a Mental Health Defense*

Appellant's father testified that on October 31, 2012, his wife (appellant's mother) phoned from their home to alert him that appellant had been screaming at her and throwing things. He returned home, where appellant said he was angry at his mother because she had refused to give him money to buy "spice" (synthetic marijuana). Appellant's parents attempted to leave through the garage, but appellant began choking his mother. He told his father he

---

[3] When the police found appellant's cell phone, there was tape across the phone's camera.

12

would stop if his father closed the garage door. Appellant's father complied, and appellant stopped choking his mother; the choking had lasted 10 to 15 seconds. As a result of this incident, appellant was charged in 2013 with an unspecified crime. His parents provided the prosecutor with medical records showing appellant had a history of mental illness, and hired a defense attorney to advocate for appellant's treatment rather than punishment.

Forensic psychiatrist Kory Knapke, M.D., testified that he conducted a psychological evaluation of appellant in connection with the 2013 case. He had not evaluated appellant again for the instant case, and he did not offer any opinions regarding appellant's mental state at the time of the instant offense. Dr. Knapke testified that during his 2013 evaluation, appellant said that he had been psychotic as a result of using spice at the time he choked his mother, but that he was not acting on a delusion (instead, he was acting on anger at being refused money to buy more spice). Dr. Knapke further testified that spice can cause "very violent psychotic symptoms . . . ." Appellant also told Dr. Knapke that methamphetamine was his drug of choice. Dr. Knapke testified that extended, heavy use of meth can cause severe paranoid symptoms and violent behavior, sometimes causing users to be "misdiagnosed with a major mental illness, like schizophrenia, or bipolar disorder, or schizoaffective disorder . . . ."

Dr. Knapke testified that in his report from the 2013 evaluation, he had opined that appellant was neither

13

psychotic nor delusional.  He explained, "I was very reluctant to give him a diagnosis of a psychotic disorder, such as schizophrenia or bipolar disorder, given his extensive history of drug abuse, which dated back to his teenage years.  [¶] And I recommended in my report that the defendant remain clean and sober from all substances for a good six months, and then be reevaluated once he is clean and sober to determine if there's any ongoing psychotic symptoms or mood symptoms that might need [to be] treated, so that we can more accurately give him the diagnosis that truly fits with him."  Appellant's attorney had disclosed Dr. Knapke's report to the prosecution in an attempt to secure a more favorable result for appellant in the 2013 case.

Appellant was placed on probation as part of a plea deal in the 2013 case.  After his arrest for Fisher's murder in 2017, during a recorded phone conversation appellant had in jail (which was played for the jury), appellant made the following aside: "I was here in 2013, for -- you know, I beat 50 years in 2013."

### 6. *The Arias Incident*
#### a. *Ruling on Admissibility*

At the time he killed Fisher, appellant was enrolled as a student at Antelope Valley College.  Cinthia Arias was also a student there.  Before trial, the People filed a motion in limine to introduce evidence of an incident several weeks before Fisher's killing, in which appellant made aggressive sexual advances on Arias at their school.  The People

14

expressed an intent to use this evidence to argue that appellant made a sexual advance on Fisher. Anticipating an objection that the evidence was barred by Evidence Code section 1101, subdivision (a), which prohibits the admission of evidence of a defendant's uncharged conduct to prove he acted in conformity with a propensity for such conduct, the People argued the evidence was admissible to prove motive under Evidence Code section 1101, subdivision (b), which allows the use of evidence of a defendant's uncharged act to prove a fact "other than his or her disposition to commit such an act." Specifically, the People argued that by supporting an inference that appellant made a sexual advance on Fisher, the evidence supported a further inference that Fisher's rejection of this advance motivated appellant to kill her. Appellant filed a motion in limine to exclude the evidence.

The trial court held a hearing on the admissibility of evidence of the Arias incident. After the court noted there was no independent evidence that appellant made a sexual advance on Fisher, the prosecutor argued as follows: "I'm not alleging a sexual assault because in my mind nothing like that happened, but what did happen is he propositioned her. She said no and he became angry and attacked her. And I'm going to argue that with or without Miss Arias. But I think that is something that will sound somewhat outlandish to a lot of jurors if they don't understand that he is a person who is comfortable doing that." The court ultimately accepted this reasoning, stating, "I think what [the prosecutor is] saying is, look, unlike most people, unlike most men,

15

[appellant] has a certain comfort level. It's driven by a motive for female companionship or for sex, but he has this motive coupled with this comfortableness where he doesn't mind approaching women in ways that can be highly offensive toward women. And that because he has exhibited that comfort level just three weeks prior, that is circumstantial evidence that that's what happened in this case. That when he propositioned the current victim in this manner, it went bad in the sense that she reacted negatively, perhaps even strongly. That then caused him to react and there was this building up and escalation until there was this physical alteration that led to death." The court concluded the evidence was admissible for the proffered purpose under Evidence Code section 1101, subdivision (b).

**b. *Arias's Testimony***

Arias testified that in June 2017, several weeks before Fisher's killing, she visited the college's office and saw appellant, whom she did not know, sitting inside. While she waited to speak with a college employee, appellant came up behind her, and she felt an object strike her leg and fall to the floor. She ignored it until appellant said, "Ma'am, you dropped something on the floor." She picked up the object and, discovering it was a condom, discarded it, telling appellant it was not hers. He reiterated that he had seen it fall out of her pocket. The college employee then became available to speak with Arias. During their conversation, within earshot of appellant, Arias stated her phone number.

16

When Arias left the office, appellant followed her. She testified, "He kept telling me -- he kept referring back to the condom. Kept saying, 'Ma'am, ma'am, I know it's yours.' Wanting me to show him how to use it because I was an older woman. And by that point I got really scared so I ran into my car and drove off. [¶] . . . [¶] Even though I could have walked to where I was going." She told appellant she was married and uninterested, but he persisted in following her to her car.

Arias circled the campus in her car to prevent appellant from discerning her destination. When she parked, she received a phone call from an unknown number, which she answered. The caller identified himself as "the guy with the condom incident," and asked her to have coffee with him, again referring to the condom and asking her to show him how to use it. She said no, reiterated that she was married, and hung up. Preparing to block his phone number, she noticed she had received text messages from the same number, including a message stating, "'I find you very attractive!!!'" Feeling "really scared," she blocked the number and reported the incident to the on-campus sheriff's office.

On cross-examination, Arias acknowledged that appellant had not threatened her or displayed anger.

### B. *Defense Case*

Appellant did not testify. He called only one witness, psychiatrist Jack Rothberg, M.D., Ph.D. Dr. Rothberg

testified that mental health records dating back to 2003, when appellant was 16 years old, reflected diagnoses of ADHD and bipolar disorder. The records also reflected an unusually large gap between appellant's verbal IQ and performance IQ, which was indicative of a problem in the structure of his brain. A 2003 report of brain imaging results reflected "a great many abnormalities," including abnormalities affecting areas of the brain controlling emotions and decisionmaking. Other records indicated appellant was placed on a psychiatric hold in 2011 as a result of erratic behavior, including "running around naked in the desert believing that people were trying to kill him." These records also stated that appellant denied his psychosis, which Dr. Rothberg interpreted to show that appellant had little insight into his medical condition, increasing the likelihood he would believe his delusions were real and act upon them. Later medical records were consistent with these. Additionally, non-medical records from appellant's college indicated that appellant had cut the cord to a camera during a computer class, for no apparent reason other than presumed paranoia.

In addition to reviewing appellant's medical records, Dr. Rothberg received a summary of appellant's father's description of appellant's symptoms, and personally examined appellant on January 23, 2019. Dr. Rothberg opined, "He's got major mental disorder, a psychosis, which simply means he has delusions and hallucinations at times." He defined delusions as thoughts "out of touch with reality,"

such as a belief that one's life is being threatened by Martians, and hallucinations as false sensory perceptions. Dr. Rothberg continued, "Now, to be more specific, it is challenging because he has a second problem, which is the substance abuse and, in particular, the use of methamphetamine, which aggravates the psychosis. . . . [O]rdinary people, if they use enough methamphetamine, will become delusional. They will become paranoid, and they may hear voices. So those two interact, and it is difficult to know how much is one and how much is the other." With reference to Dr. Knapke's 2013 report, he testified, "[I]f there is ongoing use of drugs, then you really don't know what's going to be left when the drugs stop and whether it is going to go in one direction or another. So that's why it is difficult." He concluded that appellant had a severe mental illness, and that diagnoses of schizophrenia, bipolar disorder, and schizo-affective disorder all "could potentially be correct."

Dr. Rothberg indicated that appellant's symptoms were not limited to hallucinations and delusions. Specifically, he testified that appellant's illness caused "substantially impaired ability to make a rational decision." Dr. Rothberg elaborated, "He doesn't have restraint. He can't say, 'Well, if I do such and such, this will follow.' So he's just thinking about that in a very kind of primitive, almost animal-like way."

On cross-examination, Dr. Rothberg testified that appellant's medical records made "many" references to

19

concerns of malingering, which he defined as "feigning or pretending an illness that does not exist." He further testified, "[I]n this case, there is certainly evidence of the capacity to malinger. [¶] . . . [¶] Not always being truthful, exaggerating, taking advantage of certain situations. So I think what we've got is some serious, real problems, and also this additional component which we can't really deny." Dr. Rothberg acknowledged he had concluded, in a written report, that appellant had substantial antisocial personality characteristics. He had further concluded appellant was prone to violence, and could be manipulative, aggressive, threatening, intimidating, and predatory.

The parties stipulated to the following testimony from forensic psychiatrist Risa Grand, M.D., which was read into the record: "The defendant meets criteria for unspecified schizophrenia spectrum and other psychotic disorder. He may meet diagnostic criteria for schizoaffective disorder versus substance-induced psychosis. I do believe he demonstrated symptoms of paranoia, a belief in a conspiracy theory, and unusual presentation of seeming sweaty. He may have been using methamphetamine at the time of the instant offense. [¶] I do believe he has a major mental illness, has received treatment for it since he was 15 years old, and symptoms were present at the time of the instant offense. He also has a history of cannabis use disorder, amphetamine-type use disorder, and alcohol use disorder."

## C. *Jury Instructions*

The trial court instructed the jury on premeditated and deliberate murder, and further instructed the jury that it could consider evidence of hallucinations, provocation, and voluntary intoxication in deciding whether appellant premeditated and deliberated. The court also delivered instructions on two theories of voluntary manslaughter, viz., heat of passion and "imperfect" self-defense. Outside the presence of the jury, the court declined to instruct the jury on "complete" self-defense, explaining, "The defendant did not testify. He did not claim self-defense. None of [his] statements to the detectives asserted any type of self-defense. There are no statements to the doctors claiming self-defense. There were no pieces of physical evidence that indicated self-defense. [¶] Now, the defendant did have a slight bruise under one of his eyes, but that by itself, without anything more, I don't think is enough to give self-defense. [¶] We have a victim who has strangulation marks, who was killed, in that regard. We have the defendant with no injuries that would indicate any type of need for a deadly use of force."

The court instructed the jury, per CALCRIM No. 362, that if appellant had made a false or misleading pretrial statement related to the charged crime, "knowing the statement was false or intending to mislead," the jury was permitted to infer that the statement showed he "was aware of his guilt of the crime . . . ." The instruction continued, "If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance." The court

21

further instructed the jury, per CALCRIM No. 3428, that it could consider evidence that appellant "suffered from a mental disease or defect or disorder . . . only for the limited purpose of deciding whether, at the time of the charged crime, the defendant acted with the intent or mental state required for that crime." Defense counsel did not object to these instructions or request modification.

The court instructed the jury that it was permitted to consider evidence of appellant's uncharged conduct (i.e., the Arias incident) in deciding whether appellant "had a willingness to proposition women in certain ways . . . ." It further instructed the jury that the attorneys' arguments were not evidence and should be disregarded to the extent they were inconsistent with the jury instructions.

### D. *Guilt-Phase Arguments and Verdict*[4]

The first prosecutor to deliver closing argument argued that appellant and Fisher became embroiled in a conflict upon her completion of her work on his refrigerator. The prosecutor continued, "I don't know what the conflict necessarily is about, right? From the evidence we heard, it sounds like knowing how he is, . . . probably he hit on her. . . . And I'm sure she turned him down. [¶] . . . [¶] But it doesn't matter what the conflict is about. Whether it was that [i.e.,

---

[4]    We provide additional information concerning the guilt-phase arguments in our discussion of appellant's challenges to many remarks made by the prosecutors.

22

Fisher's rejection of an advance], whether it was that he was unhappy with the refrigerator work, it cost too much money, whatever it is, it does not really matter. The point is [he] gets mad at her about something. And he punches her in the face at least 24 times. Because . . . there are 24 separate bruises or abrasions on her."[5] Noting that appellant was much larger than Fisher, he argued appellant's blows caused Fisher to fall to the ground before he strangled her.[6]

The prosecutor argued the fact that appellant inflicted numerous blows to Fisher's body and strangled her for a substantial period of time -- which he estimated as two minutes, relying on the medical examiner's testimony that the brain began to die after 90 seconds -- proved the killing was premeditated and deliberate. He asked the jury to imagine that appellant was "crushing her with all of his strength and weight to kill her" throughout the two minutes, and argued, "That is an eternity that she is there struggling and dying. And every one of those seconds, he could have stopped. Don't tell me he didn't think about what he was doing and decide to just do it. [¶] There is no way to do this

---

[5] The prosecutor understated the number of bruises and abrasions on Fisher's body. The People observe, and appellant does not dispute, that the medical examiner identified an estimated 36 such injuries.

[6] According to the medical examiner, Fisher was 5' 4" tall, and weighed 165 pounds. Appellant, who had played football at his college the year before, told the detectives he was 6' 1" tall, and weighed nearly 300 pounds.

to another person and not realize what he is doing, and decide to finish it. That is a first degree murder."

The prosecutor argued there was no evidence that Fisher provoked appellant. Acknowledging that the evidence indicated Fisher punched appellant, he argued that she did so only in self-defense. Noting her relatively smaller frame, he characterized the theory that *appellant* acted in self-defense as "ridiculous."

Defense counsel argued the case was "about . . . delusion and mental illness." He asserted that the imperfect self-defense theory of voluntary manslaughter is satisfied where either the defendant's belief in an imminent threat or his belief in the need to counter the threat with deadly force is "unreasonable, i.e., delusion." Similarly, he asserted that the theory concerns "[t]he notion someone's head is not screwed on right and delusional." Relying exclusively on evidence of appellant's delusions, he argued appellant acted on a belief that he needed to defend himself from Fisher. Specifically, he implied appellant acted on a delusional belief that Fisher was planting or retrieving a surveillance device in the refrigerator.[7]

Defense counsel urged the jury to reject, as speculative, the prosecution theory that appellant made a sexual advance on Fisher. In the alternative, he asked the jury to assume

---

[7]     As explained below, defense counsel's "delusional self-defense" theory was invalid as a theory of manslaughter. (*People v. Elmore* (2014) 59 Cal.4th 121, 130 (*Elmore*).)

24

the truth of the sexual-advance theory, and argued that Fisher responded to the advance by insulting or punching appellant, provoking him into a heat of passion.

Defense counsel argued the prosecution had failed to prove premeditation and deliberation, particularly in light of Dr. Rothberg's testimony that appellant's mental illness interfered with his decisionmaking and impulse control. He disputed the prosecutor's assertions that appellant punched Fisher 24 times and strangled her for two minutes, characterizing the assertions as an attempt to inflate the time in which appellant might have deliberated. He reminded the jury that it could consider evidence of hallucinations or voluntary intoxication in deciding premeditation and deliberation, asking, "[H]ow can you meaningfully deliberate if you're laboring under [a] delusion? . . . Are you meaningfully reflecting if you think that there's something -- somebody is planting a device in your refrigerator?"

A different prosecutor delivered the rebuttal. While suggesting that appellant made a sexual advance on Fisher as he had made on Arias, she argued it was immaterial whether appellant became angry with Fisher because of the rejection of a sexual advance or any other reason, such as dissatisfaction with the refrigerator repair. She argued that premeditation and deliberation were shown by appellant's inflicting many blows on Fisher's body and strangling her for a substantial period of time.

25

The jury convicted appellant of murder and found the murder premeditated and deliberate.

### E. *Sanity Phase*

At the sanity phase, appellant waived his right to a jury trial. Forensic psychiatrist Rose Pitt, M.D., was the sole sanity-phase witness. A psychological report she had written, based on interviews with appellant conducted over six days between February 2018 and May 2019, was admitted into evidence. All evidence from the guilt phase, including the testimony of Drs. Grand, Rothberg, and Knapke, was admitted into the sanity-phase record. Two reports by Dr. Grand and two reports by Dr. Rothberg were also admitted.

### 1. *Dr. Pitt's Report and Testimony*

In her own words, Dr. Pitt's report "exhaustively" recited appellant's statements. These included his statement that he had resisted the instructions of voices that "wanted him to do something against his values and morals; they wanted him to kill an African-American." In his first five interviews with Dr. Pitt, appellant consistently claimed he did not recall being present when Fisher was killed. In his fifth interview, he told Dr. Pitt that while Fisher had been working on the refrigerator, he had heard voices talking about a surveillance device in the house. The voices also had told him that he would "have to suck Black dicks for the rest of his life," and that a man he had stolen from was

going to kill him. He also had heard his parents' voices telling him to protect them. He told Dr. Pitt he had been suspicious of Fisher because she had not really fixed anything. But he maintained that he did not recall being present when Fisher was killed.

In his sixth and final interview, appellant told Dr. Pitt that he recalled fatally strangling Fisher. He again claimed to have heard his parents' voices telling him to protect them, but clarified that he had not heard any voice telling him to kill Fisher. Instead, he had grown suspicious of her because she had looked under the refrigerator, put something in her pocket, and failed to accomplish anything helpful. He had concluded she was present to use a surveillance device to collect evidence related to his theft from one man and his unspecified connection to another man. He had further concluded she was a "snitch" who would deliver this evidence to the men, who would then kill him and his parents. He had therefore ambushed her from behind, causing her to strike him in an attempt to defend herself. After she had fallen unconscious, he had "'felt remorse,'" moved her to a couch, and unsuccessfully attempted to restore her breathing. He told Dr. Pitt, "'It was horrific, I'm not sitting here making excuses, I am just telling you why I did it.'" Dr. Pitt concluded, "He was very conflicted about hurting her but wanted to prevent her from giving the recording devi[c]e to someone who would then kill him and his family."

Dr. Pitt opined that appellant had a psychotic illness independent of any substance use disorder, and that he had

not malingered.  She concluded that appellant had understood the nature of his actions at the time he killed Fisher.  She further concluded, "[Appellant] did understand the difference between right and wrong but not the wrongfulness of his actions at the time of the instant offense due to his psychotic mental illness."  Similarly, she testified, "I believe that he understood that to kill someone was wrong, but he committed the crime because of his delusional beliefs that the victim [Fisher] . . . was in collusion with other people that wanted to hurt him and that he was going to be killed and/or his family."  More specifically, she opined that appellant had believed Fisher would plant or retrieve a surveillance device and thereby "provide information to other people who were going to hurt him . . . ."

### 2. *Dr. Grand's Reports*

Dr. Grand's first report was prepared in September 2018, after an examination of appellant the month before.  She opined that appellant had understood the nature and quality of his actions at the time of Fisher's killing.  She indicated she was unable to form an opinion on whether he had understood the wrongfulness of his actions, as appellant had been unable or unwilling to discuss Fisher's killing with her.  She noted, "He minimized his ability to remember what happened on the day of the instant offense and did not want to implicate himself, which directly is concerning and goes against being able to plead [not guilty by reason of insanity]."

Dr. Grand's second report was prepared in June 2019, after she had reviewed additional materials, including Dr. Pitt's report and an investigator's notes from a November 2018 interview of appellant. According to Dr. Pitt's report, appellant claimed that he had been uncomfortable during Dr. Grand's examination due to the proximity of corrections officers, and that Dr. Grand had spoken with him for only a short time before abruptly terminating her examination when he failed to immediately respond to a question about Fisher's killing. Dr. Grand acknowledged that she had examined appellant near corrections officers, but found his description of her examination misleading, noting she had spoken with appellant for nearly an hour before he refused to discuss the killing.

The investigator's notes indicated that appellant had given an account of the killing similar to his account in his final interview with Dr. Pitt: Fisher's behavior made him suspicious and led him to conclude that she was planting a surveillance device for a purpose related to his prior theft from the Aryan Brotherhood. He heard his parents' voices telling him to protect them, leading him to believe that Fisher's surveillance would eventually endanger his and his parents' lives. He strangled Fisher for 60 seconds, rendering her unconscious, and then strangled her for another 30 seconds to ensure she was dead. Appellant told the investigator, "'I didn't want her to be alive at all. I didn't want her to snitch me out and hurt me and my family.'" He

further stated he had searched Fisher's body, found her driver's license, and wiped his fingerprints off the license.

Dr. Grand opined that the evidence for an insanity finding was "extremely" weak. She explained, "With regard to moral and legal wrongfulness, while it is possible that he did not at the instant time of the crime appreciate the moral or legal wrongfulness of his actions, there is more data in my mind to suggest that he did understand that it was wrong, based on the fact that he has given inconsistent stories and accounts of the reasons for his actions of what occurred that day, his attempt to clean the crime scene including wiping fingerprints, his lack of expression of concern for these overt delusions and auditory hallucinations he stated he experienced not being shared with police officers during interviews initially[,] and . . . [appellant's] inconsistent account of my interactions with him in [Dr. Pitt's] report, which leads me to believe that the defendant habitually misinterprets situations to his benefit, lies, and may even overstate symptoms and pejorative actions towards him."

### 3. *Dr. Rothberg's Reports*

Dr. Rothberg's first report was prepared in January 2019, after an examination of appellant earlier that month. During the examination, appellant "acknowledge[d] that many of the things he had said to the detective[s] were fabricated lies to avoid criminal responsibility." He further acknowledged that he had strangled Fisher, claiming to have heard his parents' voices telling him to protect them.

Appellant did not claim to have believed that Fisher was planting or retrieving a surveillance device, or that she would deliver information to anyone who would kill him or his parents; rather, he claimed to have believed that Fisher's actions would "manipulate him to do things for blacks, like suck their dicks." He claimed to have felt he was in jeopardy, but acknowledged that Fisher had done "nothing specific" to cause him to feel that way. Dr. Rothberg did not expressly address whether appellant had understood the wrongfulness of the killing.

Dr. Rothberg's second report was prepared in May 2019, after Dr. Rothberg had reviewed additional documents, including records of appellant's treatment at Antelope Valley Rehabilitation Center in 2015. These records "confirm[ed] the presence of very substantial polysubstance abuse," and indicated that appellant had a "long history" of both malingering and violence, including violence "apart from psychosis . . . ." Dr. Rothberg found the additional evidence of malingering "not completely surprising, especially in light of [appellant's] concocted story to the police regarding what had happened during the murder." Again, Dr. Rothberg did not expressly address whether appellant had understood the wrongfulness of the killing. Instead, he concluded, "All I can say is that [appellant] certainly has a psychotic disorder, that he becomes very violent and agitated when he is not on medication, that he has at times heard voices, but that he also has substantial antisocial personality characteristics, is prone to violence and acting-out behavior, in addition to

substance abuse.  One just cannot be certain what percentage of any of that mixture contributed to the murder of the victim in this case.  I believe the most likely explanation is that it is a combination of severe mental disorder, combined with very substantial antisocial personality characteristics."

### 4. *Sanity-Phase Arguments*

Appellant's counsel argued appellant had been incapable of understanding the moral wrongfulness of killing Fisher at the time he killed her.  Counsel urged the court to accept Dr. Pitt's opinion to that effect, arguing she was the most reliable expert because she had spent the most time with appellant.  He observed that appellant had told both Dr. Pitt and Dr. Rothberg that the killing resulted from a delusion.

The prosecutor urged the court to accept Dr. Grand's opinion that appellant likely had understood the moral wrongfulness of killing Fisher.  He argued Dr. Pitt's contrary opinion was unreliable, in part because she had relied on appellant's report of a delusion that Fisher's planting or retrieval of a surveillance device would eventually endanger his and his parents' lives, despite appellant's failure to report a delusion of that nature in his first five interviews with her.  The prosecutor argued that appellant's understanding of the wrongfulness of the killing was reflected in his attempts to hide or destroy evidence, his jailhouse statement to a friend that he had previously beaten

a case in which he had faced a 50-year sentence, and his statement to the detectives that the reason for the killing implicated him and made him guilty of a crime.

In rebuttal, appellant's counsel again argued that the record supported an inescapable conclusion that appellant had experienced "paranoid schizophrenic delusional thinking" at the time of the offense. He neither specified the nature of appellant's reported delusions, nor related them to appellant's ability to understand the wrongfulness of the killing.

### 5. *Sanity Verdict*

The trial court found (as the parties had not disputed) that appellant had a mental disease or defect, but that he had understood the nature and quality of his actions at the time of the offense. The court further found that appellant had failed to establish, by a preponderance of the evidence, that he had been unable to understand the moral wrongfulness of his actions at the time of the offense.

The court acknowledged that the evidence of appellant's delusions indicated that at the time of the offense, appellant "lived in [an] altered reality to a degree where he felt that people were pursuing him." However, the court found the *nature* of appellant's delusions at the time of the offense to be critical, finding "he was not under the delusion that he had to kill [Fisher] for his protection or his family's protection." The court reasoned that such a delusion was inconsistent with appellant's actions, inferring appellant's

consciousness of guilt from, inter alia, the following: (1) appellant's attempts to hide or destroy evidence, reflected in his dragging Fisher's body from the kitchen to the garage and washing clothing immediately after the killing; (2) appellant's "elaborate" false statements to the detectives about an intruder, which displayed "a level of sophistication"; and (3) appellant's claim to Dr. Pitt, which the court found to be false, that he had attempted to place Fisher on a couch and restore her breathing. Among the four experts who had provided evidence -- Drs. Grand, Rothberg, Knapke, and Pitt -- the court found Dr. Pitt the least helpful, reasoning that her reliance on appellant's statements had been excessive and "unquestioning," in light of her failure to address inconsistencies in his statements.

The court concluded, "This [decision] weighed heavily on my mind last night. I was very well aware that if I found him sane and if I got it wrong, that he would be spending a lifetime in some very difficult conditions. . . . I have family members who are dealing with . . . other mental issues, and I even thought about . . . how would I feel if my family member . . . were put into a prison situation, wouldn't I want something more for them? And so I'm keenly aware of the implication of my decision. It was a hard decision but I think I need to make the right decision. And so I ultimately find him sane. [¶] I wish that weren't the case. I wish we could do something else, but I think ultimately, justice for the family and just the right result drives this decision."

**F. *Sentencing***

Appellant admitted the truth of the three-strikes and serious-felony allegations concerning his 2013 conviction for criminal threats. Appellant's counsel made an oral *Romero* motion to strike the three-strikes enhancement, submitting on the 2013 conviction's age and, generally, the record before the court. The court denied the motion, observing that the 2013 conviction was not very remote in time and finding that appellant fell squarely within the spirit of the three strikes law. Appellant's counsel did not ask the court to exercise its discretion to strike the serious-felony enhancement.

The court sentenced appellant to an aggregate term of 55 years to life, comprising a 25-years-to-life term on the first degree murder conviction (doubled under the three strikes law) and the five-year serious-felony enhancement. Appellant timely appealed.

## DISCUSSION

Appellant challenges the guilty verdict on the grounds that (1) no substantial evidence supported the jury's finding of premeditation and deliberation; (2) the trial court prejudicially erred by admitting the evidence of the Arias incident; (3) the court prejudicially erred by failing to modify CALCRIM No. 3428 to permit the jury to consider evidence of appellant's mental illness in deciding whether his false pretrial statements to the detectives were *knowingly* false, as necessary to support an inference of consciousness of guilt; (4) many of the prosecutors' remarks during closing

argument constituted misconduct; and (5) his trial counsel were ineffective for failing to object to the admission of testimony from appellant's father regarding appellant's motive for reporting an intruder several weeks before Fisher's killing. Appellant also challenges the sanity verdict, contending the trial court misapplied the law by relying on its personal belief that finding appellant sane was necessary to deliver justice to Fisher's family, and asserting that the court erred in various ways in describing and weighing the sanity-phase evidence. We construe appellant's assertion of the latter errors as a contention that no substantial evidence supported the sanity verdict under the proper legal standard. Finally, appellant challenges his sentence on the ground that his trial counsel were ineffective for failing to ask the court to exercise its discretion to strike his five-year serious-felony enhancement.

### A. *Premeditation and Deliberation*

Appellant contends no substantial evidence supported the jury's finding that his murder of Fisher was premeditated and deliberate.

#### 1. *Principles*

A decision to kill is "premeditated" if considered beforehand and "deliberate" if resulting from careful thought and weighing of competing considerations. (*People v. Lee* (2011) 51 Cal.4th 620, 636.) The required extent of reflection may occur quickly. (*Ibid.*) "A finding of deliberation and

36

premeditation is not negated by evidence a defendant's mental condition was abnormal or his perception of reality delusional unless those conditions resulted in the failure to plan or weigh considerations for and against the proposed course of action." (*People v. Stress* (1988) 205 Cal.App.3d 1259, 1270; accord, *People v. Bobo* (1990) 229 Cal.App.3d 1417, 1434, review granted Oct. 11, 1990 (S016988) and opinion superseded (Cal. 1990) 274 Cal.Rptr. 370, and publication ordered Dec. 11, 1991 (Cal. 1991) 3 Cal.Rptr.2d 677.)

In assessing the sufficiency of evidence of premeditation and deliberation, courts often consider three "*Anderson* factors": planning, motive, and manner of killing. (*People v. Shamblin* (2015) 236 Cal.App.4th 1, 10 & fn. 16 (*Shamblin*), citing *People v. Anderson* (1968) 70 Cal.2d 15, 26-27.) The *Anderson* factors are merely guidelines. (*People v. Gonzalez* (2012) 54 Cal.4th 643, 663.) Although motive is one *Anderson* factor, "the lack of a discernable rational motive does not preclude a conviction for first degree premeditated murder." (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 202; accord, *People v. Thomas* (1992) 2 Cal.4th 489, 519 (*Thomas*) ["'A senseless, random, but premeditated, killing supports a verdict of first degree murder'"].)

"In reviewing a sufficiency of evidence challenge, we view the evidence in the light most favorable to the verdict and determine whether *any* rational trier of fact could have found the essential elements of the crime proven beyond a

reasonable doubt." (*People v. Gonzalez*, *supra*, 54 Cal.4th at 653.) We do not review "the theories articulated in the prosecutor's argument," but instead review "the evidence presented and the possible inferences drawn therefrom . . . ." (*People v. Perez* (1992) 2 Cal.4th 1117, 1125-1126; accord, *People v. Clark* (2011) 52 Cal.4th 856, 947.)

### 2. *Analysis*

Substantial evidence supported the jury's finding of premeditation and deliberation. The manner in which appellant killed Fisher strongly supported the jury's finding. The medical examiner's testimony supported findings that appellant applied sufficient pressure to Fisher's neck to cause internal bleeding and block her carotid arteries, and maintained that level of pressure for at least 90 seconds. (See *Shamblin*, *supra*, 236 Cal.App.4th at 11 [evidence that defendant "applied significant force to the victim's neck for a significant period of time" weighed in favor of finding premeditation and deliberation].) Further, the jury reasonably could have inferred that appellant dealt Fisher a series of blows before the fatal strangling in order to overcome her resistance, as evidenced by (1) Fisher's many bruises and abrasions; (2) the medical examiner's interpretation of Fisher's wounds as evidence that she had attempted to defend herself, both by blocking a blow to her chest or head, and by punching her assailant; (3) the evidence of appellant's DNA under Fisher's fingernails; and (4) appellant's black eye. (See *id.* at 12 [defendant's hitting

38

victim's head several times, while victim fought back, "necessarily prolonged the duration of defendant's attack and thus afforded him additional time to deliberate on his decision to kill the victim" (footnote omitted)].) The jury reasonably could have inferred that in the course of battering Fisher to overcome her resistance and crushing her neck for 90 seconds or more, appellant considered what he was doing and made a deliberate decision to end Fisher's life. (See *ibid.* [evidence of approximately five-minute strangulation preceded by struggle was "substantial evidence of premeditation and deliberation in itself"]; cf. *People v. Williams* (2018) 23 Cal.App.5th 396, 412 [where "the victim was stabbed twice in the neck, had a defensive cut on her thumb, and had recent blunt force injuries," jury reasonably could have interpreted victim's injuries as evidencing premeditation and deliberation].)

Evidence of motive further supported a finding of premeditation and deliberation, as the jury reasonably could have inferred that appellant was motivated to kill Fisher in retaliation for her perceived role in planting or retrieving a surveillance device in his refrigerator. Indeed, appellant's own counsel implied this was his motive. It is immaterial that the prosecution did not argue this motive. (See *People v. Perez, supra*, 2 Cal.4th at 1125-1126; *People v. Clark, supra*, 52 Cal.4th at 947.) It is also immaterial that this motive was delusional. (See *People v. Bobo, supra*, 229 Cal.App.3d at 1433-1436 [substantial evidence supported jury finding that defendant's killing of her children was premeditated

and deliberate, where defendant was motivated by paranoid delusion that killing was necessary to save children from worse fate, and defendant was "purposefully planning and acting in the context of that delusion"]; *People v. Stress*, *supra*, 205 Cal.App.3d at 1268-1271 ["strong" evidence supported trial court's finding, after bench trial, of premeditation and deliberation, where defendant's killing of his wife was motivated by desire to draw public attention to his delusional conspiracy theories, even though trial court found this motive delusional and "'crazy'"].)

In sum, the jury's finding of premeditation and deliberation was supported by substantial evidence. Though the *Anderson* factors are merely guidelines, they support our conclusion, as there was both evidence of motive and strong manner-of-killing evidence.

### B. *Evidence of Uncharged Conduct*

Appellant contends the trial court prejudicially erred by admitting evidence of the Arias incident, which he argues should have been excluded under the relevance rule, Evidence Code section 1101, or Evidence Code section 352. We agree the evidence was admitted in violation of Evidence Code section 1101. However, we conclude the error was harmless.

### 1. *Principles*

Generally, "evidence of a person's character or a trait of his or her character," including such evidence in the form of

40

"evidence of specific instances of his or her conduct," is inadmissible "when offered to prove his or her conduct on a specified occasion." (Evid. Code, § 1101, subd. (a).) This rule does not prohibit the admission of "evidence that a person committed a[n] . . . act when relevant to prove some fact (such as motive . . .) other than his or her disposition to commit such an act." (*Id.*, § 1101, subd. (b).) "'[T]he probativeness of other-crimes evidence on the issue of motive does not necessarily depend on similarities between the charged and uncharged crimes, so long as the offenses have a direct logical nexus.'"[8] (*People v. Fayed* (2020) 9 Cal.5th 147, 191 (*Fayed*).)

The erroneous admission of evidence violates a defendant's federal due process rights if it renders the trial fundamentally unfair. (*People v. Covarrubias* (2011) 202 Cal.App.4th 1, 20 (*Covarrubias*); cf. *People v. Abilez* (2007) 41 Cal.4th 472, 503 [exclusion of proffered defense evidence violates federal constitutional right to present defense only in "extraordinary and unusual" circumstances].) Otherwise, the erroneous admission of evidence violates only state law

---

[8]　The People assert that *People v. Daveggio and Michaud* (2018) 4 Cal.5th 790 established an eight-part test for evaluating the admissibility of evidence of uncharged conduct. Not so. At the cited portion of *Daveggio*, our Supreme Court merely noted, as factual background, the trial court's articulation of eight factors it considered in deciding whether evidence of uncharged conduct was inadmissible under Evidence Code section 352. (*Id.* at 822.)

and is reviewed for prejudice under the standard established in *People v. Watson* (1956) 46 Cal.2d 818, requiring reversal only if it is reasonably probable that the defendant would have obtained a more favorable result had the evidence been excluded.  (*Covarrubias*, *supra*, 202 Cal.App.4th at 21.)  A "'reasonable'" probability under this test is one sufficient to undermine the reviewing court's confidence in the outcome.  (*In re Richards* (2016) 63 Cal.4th 291, 312-313.)

### 2. *Error*

We conclude the trial court erred in admitting evidence of the Arias incident and in instructing the jury that it could consider such evidence in deciding whether appellant had "a willingness to proposition women in certain ways . . . ."  The evidence of appellant's actions toward Fisher was not admitted to prove a fact "other than his . . . disposition" to commit such actions, as necessary to qualify for admission under Evidence Code section 1101, subdivision (b).  Though the evidence was ostensibly offered and admitted to prove motive, it was probative of motive only through the following series of inferences:  (1) appellant had a propensity for making sexual advances on unfamiliar women, as he did with Arias; (2) appellant acted in conformity with that propensity by making a sexual advance on Fisher; (3) Fisher rejected his advance; and (4) Fisher's rejection motivated appellant to kill her in retaliation.  Evidence Code section 1101, subdivision (a), barred use of the evidence to prove the first two inferences.  Without the prohibited propensity

inferences, the Arias incident had no logical nexus to the instant offense, as necessary to render the Arias incident admissible to prove motive. (See *Fayed*, *supra*, 9 Cal.5th at 191; cf. *People v. Guerrero* (1976) 16 Cal.3d 719, 726-729 [trial court abused its discretion by admitting evidence of defendant's prior rape of unrelated woman for purpose of proving defendant killed murder victim in course of attempted rape, where there was no independent evidence defendant attempted to rape murder victim].)[9]

---

[9] The cases on which the People rely do not assist them. In most, the courts deemed uncharged conduct admissible due to its similarities to the charged conduct. (See *People v. Spector* (2011) 194 Cal.App.4th 1335, 1381-1385 [in prosecution for defendant's murder of woman, trial court did not err by admitting "testimony from five women who, over a 20-year period, were the victims of armed assaults by [defendant]" to prove motive, where record revealed ten similarities among prior assaults, many of which were shared by charged offense]; *People v. Kelly* (2007) 42 Cal.4th 763, 785-786 [in prosecution for defendant's murder of woman met at fitness center in his apartment, evidence of defendant's assault on other woman in same apartment several days earlier was admissible as part of "remarkably similar and consistent pattern" of luring women from fitness center and other locations to his apartment in order to rob and rape them]; *People v. Kipp* (1998) 18 Cal.4th 349, 370-371 [uncharged and charged acts were "sufficiently similar to support an inference that defendant harbored the same intent" in committing both, where "the number and the distinctiveness of the shared characteristics" revealed "a highly distinctive pattern"].) In another, the court relied on a logical nexus between the charged and uncharged conduct independent of any prohibited propensity logic; specifically, the uncharged conduct suggested the defendant
*(Fn. is continued on the next page.)*

43

### 3. *Prejudice*

We find no extraordinary circumstances of the type necessary to render the admission of the challenged evidence a federal constitutional violation. (See *Covarrubias*, *supra*, 202 Cal.App.4th at 20-21; *People v. Abilez, supra*, 41 Cal.4th at 503.) Thus, we ask only whether it is reasonably probable that appellant would have obtained a more favorable result had the evidence been excluded. (See *Covarrubias*, *supra*, at 20-21.) We conclude it is not.

The jury was not faced with a close case. Appellant's counsel properly conceded, in the face of overwhelming evidence, that appellant intentionally killed Fisher, leaving the jury to decide only whether the killing was voluntary manslaughter or murder and, if murder, whether it was premeditated and deliberate. The case for murder was overwhelming. Appellant's heat of passion claim was founded on an admittedly speculative inference that appellant made a sexual advance on Fisher -- an inference his own counsel urged the jury to reject.[10] His imperfect

---

needed money at the time of the charged conduct, supplying a motive to rob. (See *People v. Demetrulias* (2006) 39 Cal.4th 1, 14-15.) And in the People's final cited case, we held uncharged conduct inadmissible to prove motive for the same reason we do here, viz., its lack of any logical nexus to the charged conduct. (See *People v. Scheer* (1998) 68 Cal.App.4th 1009, 1015, 1019-1020.)

[10] Appellant did not rely on evidence of delusions to support his heat of passion claim. Nor could he. (See *People v. Padilla* (2002) 103 Cal.App.4th 675, 679 ["A perception with no objective
*(Fn. is continued on the next page.)*

44

self-defense claim was premised on his counsel's assertion that he acted on a purely delusional perception of Fisher as a threat, and was therefore invalid at the guilt phase. (See *Elmore, supra*, 59 Cal.4th at 146 ["defendants who mistakenly believed that actual circumstances required their defensive act may argue they are guilty only of voluntary manslaughter, even if their reaction was distorted by mental illness. But defendants who contend they killed in self-defense because of a purely delusional perception of threat must make that claim at a sanity trial"].)[11] Even disregarding the invalidity of his "'delusional self-defense'" claim (*id*. at 130), there was insufficient evidence to satisfy the imperfect self-defense doctrine's requirement of an honest belief in an "'imminent'" threat of death or great bodily injury (*id*. at 134). Nothing but speculation could

---

reality cannot arouse the passions of the ordinarily reasonable person"].)

[11]    In support of his challenges to the sanity verdict, appellant quotes *Elmore*'s conclusion that a self-defense claim based "'solely on [a] delusion'" that allegedly "'caused the defendant to perceive an illusory threat'" is a claim of insanity, and argues he "perceive[d] an illusory threat" in this manner. (*Elmore, supra*, 59 Cal.4th at 140.) But in his challenges to the guilty verdict, appellant fails to acknowledge that under *Elmore*, it was improper for his counsel to rely on identical reasoning to urge reduction of the murder to voluntary manslaughter. (See *id*. at 145 ["a claim of delusional belief in the need for self-defense is reserved for the sanity phase, where it may result in *complete exoneration* from criminal liability. [Citation.] It may not be employed to *reduce* a defendant's degree of guilt"].)

support a finding that appellant drew a connection between Fisher and any of his prior delusions, other than his delusion concerning a surveillance device in the refrigerator she was repairing. There was no evidence appellant irrationally perceived surveillance as an imminent physical threat. Indeed, appellant neither testified nor claimed, in his admitted pretrial statements, that he had perceived Fisher as an imminent physical threat. Faced with the compelling physical evidence that appellant was the aggressor, no reasonable juror could have found a reasonable doubt whether appellant had acted on such a perception.

The case for premeditation and deliberation was also strong. As explained above, the evidence that appellant battered Fisher to overcome her resistance and crushed her neck for 90 seconds or more strongly supported an inference that appellant considered what he was doing and made a deliberate decision to end Fisher's life. And the evidence reasonably suggested a motive for doing so, viz., retaliation for her perceived role in planting or retrieving a surveillance device in the refrigerator she was working on. This motive was consistent with Dr. Rothberg's testimony that appellant had substantial antisocial personality characteristics, including tendencies toward violent and predatory behavior. In the face of this evidence, appellant neither testified nor previously claimed that his intent to kill had been impulsive rather than calculated; instead, in his only admitted statements, he denied killing Fisher at all.

46

On this record, we find no reasonable likelihood appellant would have obtained a more favorable result had the evidence of the Arias incident been excluded. Appellant's behavior toward Arias was hardly inflammatory compared to Fisher's brutal killing, and to the unchallenged evidence that appellant had choked his mother for refusing to pay for drugs. Further, contrary to appellant's contention, the evidence was not essential to "the prosecution's main theory of the case . . . ." On the contrary, both prosecutors argued it was immaterial whether appellant attacked Fisher because of her rejection of a sexual advance (the only fact they sought to prove through the challenged evidence), or for some other reason.

In sum, we conclude that even had the court excluded the evidence of the Arias incident, the jury would have found appellant guilty of premeditated and deliberate murder. We therefore find the evidence's admission harmless. (See *In re Richards*, *supra*, 63 Cal.4th at 312-313.)

### C. *CALCRIM No. 3428*

Appellant contends the trial court prejudicially erred by failing to modify CALCRIM No. 3428 (prohibiting the jury from considering evidence of appellant's mental illness for any purpose other than determining his mental state at the time of the offense) to permit the jury to consider evidence of his mental illness in deciding whether his false pretrial statements to the detectives were *knowingly* false, in light of the court's delivery of CALCRIM No. 362 (allowing the jury

47

to infer consciousness of guilt from any knowingly false pretrial statements related to the offense). He acknowledges his counsel did not object or request modification, but argues (1) the contention was not forfeited because the error violated his federal due process rights; and (2) his counsel was ineffective for failing to object or request modification. We conclude that defense counsel's failure to object forfeited the contention, and that this failure did not render counsel's assistance ineffective.

*People v. McGehee* (2016) 246 Cal.App.4th 1190 (*McGehee*), on which both parties rely, is directly on point. There, at the guilt phase of the defendant's trial for murder of his mother, the jury heard evidence that the defendant, in order to prevent discovery of his mother's body, attempted to keep his sister away from the body and made false statements to her, including statements implying their mother was still alive. (*Id.* at 1197-1199, 1204.) It was undisputed that the defendant was "mentally disturbed" at the time of the offense, though the nature and severity of the disturbance was disputed. (*Id.* at 1194.) The jury was instructed with unmodified versions of CALCRIM Nos. 362 and 3428; defense counsel did not object. (*McGehee, supra,* at 1203.) On appeal from his conviction, the defendant contended the court erred, in a manner violating his federal due process rights, by failing to modify CALCRIM No. 3428 to permit the jury to consider evidence of his mental illness in deciding whether his false pretrial statements to his sister were *knowingly* false. (*Id.* at 1204.)

48

The Court of Appeal agreed that the unmodified instruction erroneously deprived the jury of permission to consider the mental-illness evidence in assessing consciousness of guilt, reasoning that the evidence could show the false statements were *unknowingly* false (and therefore not probative of consciousness of guilt) because "mental illness or impairment has obvious relevance to the question of ability to perceive or recall events." (*McGehee*, *supra*, 246 Cal.App.4th at 1204-1205.) However, the court rejected the defendant's contention that the error violated his due process rights, reasoning that the permissive inference of consciousness of guilt was reasonable in light of appellant's attempt to keep his sister away from the body; he would have had no reason to make that attempt had he believed the truth of his implications that their mother was alive. (*Id.* at 1205-1206.) For the same reason, the court concluded the error did not affect the defendant's substantial rights, and that his trial counsel's failure to object therefore forfeited his challenge to the error on appeal. (*Id.* at 1206-1207.)

Here, as in *McGehee*, defense counsel's failure to object forfeited appellant's contention on appeal. The inference that appellant's false story to the detectives reflected consciousness of guilt was reasonable. The jury heard evidence that appellant experienced hallucinations of voices and delusions that other people intended to harm him, but heard no evidence that appellant's mental illness caused him to have false memories of his own conduct. Thus, the jury

49

reasonably could have inferred that appellant's false claim to have taken a 45-minute walk around his neighborhood, on a specified route, reflected consciousness of guilt rather than a hallucination or delusion. This inference was additionally supported by appellant's statements to the detectives that the reason for Fisher's fatal strangling "implicate[d]" him and "ma[de] him guilty of a crime eventually." The jury reasonably could have inferred that had appellant actually believed he had been walking around the neighborhood when Fisher was killed, he would not have claimed that the reason for the strangling implicated him. Because the jury reasonably could infer consciousness of guilt from appellant's false statements to the detectives, the asserted instructional error did not violate his due process or other substantial rights, and his counsel's failure to object below forfeited his contention on appeal. (See *McGehee*, *supra,* 246 Cal.App.4th at 1205-1207.)

Regardless of whether defense counsel's performance was deficient for failing to object, it was not prejudicial. (See *In re Crew* (2011) 52 Cal.4th 126, 150 ["If a claim of ineffective assistance of counsel can be determined on the ground of lack of prejudice, a court need not decide whether counsel's performance was deficient"].) As noted, the jury heard no evidence that appellant's mental illness caused symptoms comparable to false memories of taking a 45-minute walk around the neighborhood on a specific route. Thus, even had the instructions invited the jury to consider the mental-illness evidence with respect to appellant's false

50

statements, it is not reasonably probable the jury would have found he did not know his statements were false. Moreover, CALCRIM No. 362 merely permitted the jury to infer consciousness of guilt, without requiring it to do so, and made clear that the "importance" of any knowingly false statement was for the jury to decide. Even disregarding the consciousness-of-guilt evidence, the evidence was more than sufficient to support the jury's finding of a premeditated and deliberate murder. In short, we are confident the jury would have returned the same verdict even had defense counsel secured the relevant modification to CALCRIM No. 3428. (See *In re Crew*, *supra*, at 150 [counsel's deficient performance is prejudicial if probability of more favorable result absent counsel's failings is reasonable, i.e., sufficient to undermine confidence in the outcome].)

### D. *Asserted Prosecutorial Misconduct*

Appellant contends many of the prosecutors' remarks during closing argument constituted misconduct. He acknowledges that his trial counsel failed to object to any of the challenged misconduct. He argues that his misconduct claim was not forfeited because the misconduct affected his substantial rights, and (in the alternative) that his trial counsel were ineffective for failing to object.

### 1. *Principles*

A prosecutor's "use of deceptive or reprehensible methods to persuade the court or jury" violates state law,

51

and further violates the federal constitution if it "'"'"so infect[s] the trial with unfairness as to make the resulting conviction a denial of due process."'"'" (*People v. Flores* (2020) 9 Cal.5th 371, 403.) "It is prosecutorial misconduct to misstate the law. [Citation.] It is also misconduct to misstate the evidence or go beyond the record. [Citation.] However, the prosecution 'enjoys wide latitude in commenting on the evidence, including the reasonable inferences and deductions that can be drawn therefrom. [Citations.] 'A defendant asserting prosecutorial misconduct must . . . establish a reasonable likelihood the jury construed the remarks in an objectionable fashion.' [Citations.]" (*Fayed*, *supra*, 9 Cal.5th at 204.) In assessing such a likelihood, "[w]e presume not only that jurors follow instructions in general [citation], but also 'that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade' [citations]." (*People v. Potts* (2019) 6 Cal.5th 1012, 1037.)

"To preserve a claim of [prosecutorial] misconduct for appeal, a defendant must make a timely objection and ask the court to admonish the jury, unless an objection would have been futile and a request for admonition ineffective." (*People v. Flores*, *supra*, 9 Cal.5th at 403.) "When the record on direct appeal sheds no light on why counsel failed to act in the manner challenged [on a claim of ineffective assistance], [the] defendant must show that there was "'no conceivable tactical purpose'" for counsel's act or omission.

[Citations.]'" (*People v. Centeno* (2014) 60 Cal.4th 659, 675.) "'[T]he decision facing counsel in the midst of trial over whether to object to comments made by the prosecutor in closing argument is a highly tactical one' [citation], and 'a mere failure to object to . . . argument seldom establishes counsel's incompetence' [citation]." (*Ibid.*)

### 2. *Forfeiture*

Defense counsel's failure to object to any of the prosecutors' asserted misconduct forfeited appellant's misconduct claim on appeal. (See *People v. Flores*, *supra*, 9 Cal.5th at 403.) Appellant expressly disclaims any argument that objections would have been futile. Though he argues the claim was nevertheless preserved for appeal because it affected his substantial rights, he cites only one case in support of this argument, and that case did not address prosecutorial misconduct. (*People v. Espiritu* (2011) 199 Cal.App.4th 718, 724-725 [defendant did not forfeit objection to trial court's failure to record jury's not-true finding on deadly-weapon allegation].)

We conclude appellant's misconduct claim was forfeited. We nevertheless address the merits of the claim to resolve his alternative contention that his counsel were ineffective for failing to object.

### 3. *Error*

We conclude that many of the prosecutors' challenged remarks were permissible. Several fell within a prosecutor's

"wide-ranging right" to urge the jury to draw inferences from the evidence. (*People v. Tully* (2012) 54 Cal.4th 952, 1043.) These include arguments that (1) Fisher fell to the ground by the end of appellant's series of blows; (2) appellant used all his strength and weight to crush Fisher's neck; and (3) appellant watched the life drain from Fisher. We find nothing unreasonable about these inferences on the record before the jury. In another challenged remark, the prosecutor urged the jury to infer, from the number of bruises and abrasions on various parts of Fisher's body, that appellant punched Fisher "in the face" 24 times or more. The record did not reasonably support that specific inference; the dozens of injuries Fisher suffered covered more than her face, and it was speculative whether each injury was inflicted by a separate blow. But "[o]pposing counsel may not complain on appeal if the reasoning is faulty or the deductions are illogical because these are matters for the jury to determine." (*Ibid.*) The jury was equipped to reject the proffered inference, especially given that defense counsel argued, at some length, that the inference was not supported by the evidence.[12]

---

[12]     The prosecutors also encouraged the jury to draw (while deeming immaterial) an inference that appellant made a sexual advance on Fisher. In doing so, they referenced the evidence of the Arias incident. Thus, we reject appellant's contention that the prosecutors merely asserted their personal beliefs regarding a sexual advance. In any event, such assertions would have been
*(Fn. is continued on the next page.)*

54

It was also permissible for the prosecutors to make their challenged remarks to the effect that the experts were uncertain whether appellant's mental illness was substance-induced. Though Dr. Grand's stipulated testimony was somewhat ambiguous, and she was not present at trial to clarify, she appeared to express certainty that appellant had a psychotic disorder of some type ("Unspecified Schizophrenia Spectrum and Other Psychotic Disorder"), but uncertainty regarding whether his disorder was "Substance-Induced Psychosis" or another type. Both prosecutors conceded that appellant had a mental illness, and permissibly argued that Dr. Grand was uncertain whether his illness was substance-induced. Similarly, the prosecution accurately observed that Dr. Rothberg testified that appellant's drug use prevented a more certain diagnosis. Dr. Rothberg identified several diagnoses that were "potentially" correct, and testified, with reference to Dr. Knapke's 2013 report, that a more certain diagnosis was difficult because "if there is ongoing use of drugs, then you really don't know what's going to be left when the drugs stop."

As appellant observes, Dr. Rothberg did not mirror Dr. Knapke's language recommending that appellant be re-evaluated after six months of sobriety. Appellant argues it was therefore inaccurate and misleading for the prosecutor

harmless for the same reasons we found the admission of the Arias incident harmless.

55

to argue, "Dr. Rothberg and Dr. Knapke both say . . . that there are symptoms that correspond both with these schizo-type disorders as well as drug use. We can't tell which one they are or are not. We need him sober for six months to be able to tell what remains." But although the implication that Dr. Rothberg had mirrored Dr. Knapke's language was inaccurate, it was not misleading in light of Dr. Rothberg's reference to Dr. Knapke's report in support of a similar opinion. Relatedly, the prosecutor's references to these opinions clarified the prosecutor's arguments that Dr. Knapke had testified to the effect that "'there's no way that you can diagnose [appellant] with schizoaffective disorder because he's got too much drug abuse in his history,'" and "'It seems like mostly a drug problem. It's not schizoaffective disorder.'" Dr. Knapke did testify that he had concluded that appellant was neither psychotic nor delusional at the time of the 2013 examination, and that appellant's "primary" problem seemed to be drug use. The prosecutor communicated the tentative nature of these opinions to the jury by referencing Dr. Knapke's recommendation for a re-evaluation after six months of sobriety. Thus, appellant fails to show a reasonable likelihood that the jury drew, from these challenged remarks, objectionable conclusions regarding the record.

With respect to other challenged remarks, appellant fails to show a reasonable likelihood that the jury drew objectionable conclusions regarding the law. First, we are confident the jury did not interpret the following remarks as

56

a representation that appellant's mental illness was irrelevant: "There can be a temptation in a case like this to say, 'Well, he's crazy.' Well, of course he's crazy. Everyone who murders a stranger is crazy."[13] Almost immediately after making these remarks, the prosecutor discussed two ways in which appellant's mental illness was potentially relevant. Second, we are confident the jury did not interpret any of the prosecutors' remarks as a representation that premeditation and deliberation may be inferred from the passage of time alone. The prosecutors' arguments emphasized not only the time in which appellant could have premeditated and deliberated, but also the nature of his actions throughout that time, viz., battering Fisher to overcome her resistance and steadily crushing her neck. Thus, appellant's reliance on *People v. Boatman* (2013) 221 Cal.App.4th 1253 is misplaced. There, the defendant's sole action directed toward the killing -- a single gunshot to the face, using a gun taken from the victim just before -- was nearly instantaneous. (See *id.* at 1267-1271.)

---

[13] Appellant challenges the prosecutor's use of the word "crazy" in reference to people with delusional illnesses, arguing such use is demeaning and "can only be intended to incite the stigma often attached to mental illness." We express no approval of the prosecutor's use of this term, but we find it neither inflammatory nor prejudicial in the context of this case. We further note that the term's use does not compel an inference of nefarious intent. Appellant's own counsel used the term to refer to appellant and his conduct.

Finally, appellant fails to show a reasonable likelihood that the jury interpreted any remark as "disparaging defense counsel by implying [they] had fabricated a delusion defense." Appellant points out that the prosecutor remarked, "We don't even hear anything about this idea that maybe it was a delusion until he's talking to doctors like a year and a half later. And all of a sudden, he starts coming up with this -- they have this idea in their head that there's going to be a delusion defense." But the general thrust of the prosecutor's argument was that appellant had fabricated claims to the experts in accord with his asserted history of malingering. Even assuming defense counsel were included in the prosecutor' reference to "they," the most that could be inferred was the suggestion that defense counsel had shared appellant's idea to rely on his claims of delusion, not that they had induced or joined in his fabrication of the underlying claims. (See *People v. Young* (2005) 34 Cal.4th 1149, 1191-1192 [prosecutor did not imply defense counsel was responsible for witness's allegedly false testimony, where general thrust of prosecutor's argument was that physical evidence proved witness was not credible, not that defense counsel knew witness had lied]; *Thomas, supra,* 2 Cal.4th at 529-530 & fn. 14 [same, where general thrust of prosecutor's argument was that witness's boyfriend induced her allegedly false testimony, despite prosecutor's arguing, "'Now, I suppose Mr. Chaffee [defense counsel] would have you think, just another little mistake. How many mistakes

does the defense get to make before you realize perhaps they're contriving something?'"].)

The numerous remarks we have already addressed are only some of the many remarks challenged by appellant. We need not decide whether the remaining remarks were misconduct, for as explained below, we find they were not prejudicial.

### 4. *Prejudice*

The prosecutors' remaining challenged remarks were not prejudicial. They did not infect the trial with unfairness in a manner violating due process, and there is no reasonable probability the jury relied on them, rather than the ample prosecution evidence, to find that Fisher's killing was a premeditated murder.

This is particularly true with respect to the prosecutors' challenged remarks related to evidence of delusions.[14] As explained above, appellant's "delusional self-defense" claim was both improper at the guilt phase and

---

[14] These were remarks that: (1) appellant's past delusions, as evidenced by his father's testimony, all concerned being watched, rather than people coming to kill him; (2) Dr. Rothberg's examination of appellant in January 2019 was the first time appellant had reported any delusion or hallucination at the time of the offense; and (3) appellant's failure to report any delusion in his interviews with the detectives was particularly significant because "all the experts" had indicated that "'crazy people don't know that they are crazy,'" and instead believe their delusions are real.

lacking in evidentiary support, and evidence of a delusional motive for killing Fisher could support the *prosecution* case for premeditation and deliberation. Thus, to the extent the prosecutor's challenged remarks might have discredited the evidence of delusions, they were as likely to help appellant as to prejudice him.

Any potential prejudice from the remaining challenged remarks was mitigated by the jury instructions and defense counsel's arguments. (See *People v. Flores*, *supra*, 9 Cal.5th 371 at 405 ["In light of the court's cautionary instructions and defendant's challenge of the very evidence the prosecutor misstated, we discern no prejudice or denial of defendant's right to a fair trial"].) The jury was instructed that the attorneys' arguments were not evidence and should be disregarded to the extent they were inconsistent with the jury instructions. Defense counsel reminded the jury that the prosecutors' arguments were not evidence, and that no evidence directly supported the challenged prosecution argument that the strangling had lasted two minutes (30 seconds beyond the time necessary to render a victim unconscious and the brain "on its way towards death," according to the medical examiner). Further, defense counsel argued that Dr. Rothberg's testimony concerning appellant's impaired judgment and impulse control weighed against a finding of premeditation and deliberation, implicitly contradicting the prosecution's asserted implication that delusions were the only symptoms of mental

illness relevant to that issue.[15] Moreover, defense counsel reminded the jury of the instruction that it could consider evidence of voluntary intoxication in deciding whether appellant acted with premeditation and deliberation, mitigating any potential prejudice from the prosecution's asserted implication that drug-induced symptoms were irrelevant. Finally, defense counsel reminded the jury that Dr. Rothberg had never concluded appellant was malingering, and argued that Dr. Knapke was not credible because he had not examined appellant since 2013. These arguments mitigated any potential prejudice from the prosecutor's assertion that both Dr. Rothberg (who testified that appellant's medical records made "many" references to concerns of malingering) and Dr. Knapke (who did not address malingering in his testimony) had testified that *all* the mental health records they reviewed reflected concerns about malingering.

As we have explained above, the jury was not faced with a close case. For these reasons, we find no prejudice. Having found many of the challenged remarks permissible, and the remainder harmless, we conclude defense counsel

---

[15] The prosecution also assertedly implied that evidence of mental illness was irrelevant to appellant's imperfect self-defense claim, which posited that appellant acted without malice and therefore committed voluntary manslaughter rather than murder. But the jury was instructed that it could consider mental-illness evidence in deciding whether appellant acted with the intent or mental state required for murder.

were not ineffective for failing to object.  (*Thomas*, *supra*, 2 Cal.4th at 531.)

### E. *Motive for Appellant's Prior Report of an Intruder*

Appellant does not challenge the admission of evidence that some weeks prior to Fisher's killing, he reported that an intruder ransacked his house after forcing him into a closet at gunpoint.  Appellant does challenge, as speculative, his father's testimony that his motive for this prior report of an intruder was his desire to avoid blame for creating a mess in his house.  He does not dispute that his trial counsel's failure to object to this testimony forfeited his evidentiary contention on appeal.  (See *People v. Redd* (2010) 48 Cal.4th 691, 729 [applying general rule that "'trial counsel's failure to object to claimed evidentiary error on the same ground asserted on appeal results in a forfeiture of the issue on appeal'"].)  Instead, he contends his trial counsel were ineffective for failing to object.

We disagree.  Regardless of whether defense counsel's failure to object constituted deficient performance, it was not prejudicial.  The jury was equipped to understand the common-sense proposition that appellant's father could not read his son's mind.  Further, neither appellant's prior report of an intruder, nor his motive for making it, was material.  Even disregarding the prior report, it was reasonable for the jury to infer that his similar false report to the detectives reflected consciousness of guilt (as

explained above, in our discussion of appellant's contention concerning CALCRIM No. 3428). And even the latter false report was inessential to the prosecution case.[16]

## F. *Sanity*

In challenging the trial court's finding that appellant had been capable of understanding the wrongfulness of Fisher's killing at the time he killed her, appellant asserts that the court erred in various ways in describing and weighing the evidence. Both parties properly cite *People v. Belcher* (1969) 269 Cal.App.2d 215 (*Belcher*) for the proposition that we must affirm the sanity verdict if it was supported by substantial evidence.[17] (*Id.* at 220.) We therefore construe appellant's evidentiary arguments as a contention that no substantial evidence supported the sanity verdict.

---

[16] Having rejected many of appellant's contentions of error, and having found the remaining asserted errors harmless, we reject appellant's contention that he was prejudiced by the cumulative effect of the asserted errors.

[17] Elsewhere in his appellate brief, appellant asserts -- without citation to authority -- that the sanity verdict must be reversed if there is a reasonable probability that the trial court would have reached a different conclusion absent its asserted errors in describing and weighing the evidence. This unsupported assertion is at odds with appellant's own citation to *Belcher*, where the appellate court recognized its obligation to affirm a trial judge's sanity verdict unless it found "'"no hypothesis whatsoever"'" under which the evidence supported the verdict. (*Belcher, supra*, 269 Cal.App.2d at 220.)

63

### 1. *Principles*

"'[I]nsanity is established if the defendant was unable either to understand the nature and quality of the criminal act, or to distinguish right from wrong when the act was committed.'" (*People v. Powell* (2018) 5 Cal.5th 921, 955 (*Powell*).) Here, the parties' dispute concerns only the second, wrongfulness issue. This issue concerns the defendant's understanding of "generally accepted moral standards" rather than "those standards peculiar to the accused." (*People v. Coddington* (2000) 23 Cal.4th 529, 608, overruled on another ground by *Price v. Superior Court* (2001) 25 Cal.4th 1046; accord, *People v. Rittger* (1960) 54 Cal.2d 720, 734 ["The fact that a defendant claims and believes that his acts are justifiable according to his own distorted standards does not compel a finding of legal insanity"].) Though the issue concerns the defendant's understanding of morality rather than law, the defendant's knowledge that his act is illegal "will in most cases permit the inference of knowledge that, according to the accepted standards of mankind, it is also condemned as an offense against good morals." (*People v. Leeds* (2015) 240 Cal.App.4th 822, 831 (*Leeds*).)

"'If [a] mental illness is manifested in delusions which render the individual incapable either of knowing the nature and character of his act, or of understanding that it is wrong, he [or she] is legally insane . . . .'" (*People v. Blakely* (2014) 230 Cal.App.4th 771, 780 (*Blakely*).) Thus, "[a] person suffering from a delusion that causes him to fear that

another is attempting to take his life is legally insane if the facts perceived as the product of his delusion would legally justify his acting in self defense." (*Leeds, supra*, 240 Cal.App.4th at 829.) But if his delusions have no such effect, the defendant may be sane. (See *id.* at 833; *Blakely, supra*, at 781.)

"In a sanity trial, the burden is on the defendant to prove insanity by a preponderance of the evidence." (*Powell, supra*, 5 Cal.5th at 955.) We must review the record in the light most favorable to the sanity verdict and affirm if the verdict is supported by "evidence that is reasonable, credible, and of solid value, from which a reasonable trier of fact could find the defendant sane by a preponderance of the evidence." (*Id.* at 957.) "'[E]xpert testimony, even if uncontradicted, is not binding on the trier of fact, and may be rejected . . . .'" (*People v. McCarrick* (2016) 6 Cal.App.5th 227, 247 (*McCarrick*), italics omitted.)

### 2. *Analysis*

Substantial evidence supported the trial court's finding that appellant had failed to prove, by a preponderance of the evidence, that he had been incapable of understanding the wrongfulness of killing Fisher at the time he killed her. None of the expert evidence suggested that appellant's mental illness interfered with his ability to understand that killing people is typically wrong. Suggesting the opposite, he reported to Dr. Pitt (the sole expert to opine appellant had been insane at the time of offense) that he had resisted

voices telling him to violate his "morals" by killing a Black person, and Dr. Pitt testified that appellant generally "understood that to kill someone was wrong . . . ." Appellant did not testify, and he never expressly claimed in his psychiatric interviews that he had believed Fisher's killing was morally justified. (See *Blakely*, *supra*, 230 Cal.App.4th at 781 [defendant failed to establish insanity, despite his testimony he acted on delusion victim was a demon, where he failed to state "he believed it was morally acceptable to attack [victim] and take his money"].) On the contrary, when appellant finally discussed the killing with Dr. Pitt, his statements indicated he had been "conflicted" about hurting Fisher and "'felt remorse'" immediately after she died. These statements supported a reasonable inference of consciousness of moral guilt, as did the following: (1) appellant's false story to the detectives about an intruder; (2) appellant's admission to Dr. Rothberg that he had lied to the detectives to avoid criminal responsibility; (3) appellant's dragging Fisher's body from the kitchen to the garage in an apparent attempt to hide it; and (4) appellant's washing clothing in an apparent attempt to destroy DNA evidence. (See *Leeds*, *supra*, 240 Cal.App.4th at 833 [where defendant shot victims dead, acting on delusional belief that victims were conspiring to kill him, defendant's "discarding his gun and outer clothing afterwards, and attempting to leave the crime scene rather than seeking out the police, . . . indicated

that he knew his actions were wrongful"].)[18]  The foregoing was substantial evidence in support of the sanity verdict, independent of the further support provided by experts other than Dr. Pitt.[19]

The implication of appellant's arguments is that the court was compelled to accept Dr. Pitt's opinion that appellant, acting on a delusion that Fisher would provide information to men who would eventually kill him and/or his parents, had believed Fisher's killing was morally justified. Not so.  First, Dr. Pitt's opinion was far from conclusive evidence that appellant had actually experienced the reported delusion, which he had not reported in his interviews with the detectives, his interviews with the experts other than Dr. Pitt, or his first five interviews with Dr. Pitt.  Second, even assuming appellant did experience the reported delusion, Dr. Pitt failed to persuasively explain her opinion that the delusion caused appellant to believe

---

[18]     Appellant argues this evidence supported a reasonable inference only of his understanding of the *legal* wrongfulness of Fisher's killing, not his understanding of its moral wrongfulness. But he acknowledges that the former permits an inference of the latter in "most" cases. (*Leeds, supra,* 240 Cal.App.4th at 831.) He identifies no persuasive reason to deem this homicide case an exception to the general rule.

[19]     Dr. Grand opined that the case for insanity was "extremely" weak, and Dr. Rothberg opined that it was uncertain whether Fisher's killing resulted from appellant's psychotic disorder rather than from his "very substantial antisocial personality characteristics."

Fisher's killing was morally justified. As noted, appellant indicated to Dr. Pitt that he had been "conflicted" about hurting Fisher and "'felt remorse'" immediately after she died. He also told Dr. Pitt that his explanations for the "horrific" killing were not "excuses." Moreover, he indicated to both Dr. Pitt and an investigator that he had killed Fisher to prevent her from "snitch[ing]" on him in connection with a theft he had committed. Though he reportedly had believed Fisher's snitching might result in *other* people *eventually* killing him and/or his parents, such a belief would not have morally justified Fisher's murder under generally accepted moral standards. (See *People v. Rittger*, *supra*, 54 Cal.2d at 734 [expert's opinion did not undermine sanity finding, where expert's opinion was to effect that defendant's paranoid delusional thinking led him to believe victim "might attack him at some future time," and that defendant therefore felt justified in killing victim "according to defendant's personal, prison-influenced standards"]; *Leeds*, *supra*, 240 Cal.App.4th at 833 [defendant was not prejudiced at sanity phase, with respect to three of his murder victims, by instructional error prohibiting jury from evaluating defendant's self-defense claim in light of his delusions that each victim "conspired with the others to kill him," where "there was no evidence that he perceived he was in imminent danger from [those three victims], and considerable evidence that he knew he was not"].)

In sum, even had Dr. Pitt been the sole source of expert opinion, the court reasonably could have rejected Dr. Pitt's

opinion and found that appellant had been capable of understanding it was morally wrong to kill Fisher at the time he killed her. (See *McCarrick*, *supra*, 6 Cal.App.5th at 235, 246-248 [jury reasonably could have found defendant understood moral wrongfulness of murders at time of offenses, despite unanimous contrary opinions of three experts].) We conclude the sanity verdict was supported by substantial evidence.[20]

### G. *Serious-Felony Enhancement*

Appellant contends his trial counsel were ineffective for failing to ask the trial court to strike his five-year enhancement for a prior serious felony, viz., his 2013 conviction for criminal threats. The People do not argue there was a conceivable tactical purpose for defense counsel's failure to make the request. (See *People v. Centeno*, *supra*,

---

[20] Appellant also contends the trial court misapplied the law at the sanity phase by relying on its personal belief that finding appellant sane was necessary to deliver justice to Fisher's family. The record does not support this contention. The court made only a single stray remark concerning justice for Fisher's family, after a lengthy discussion of the evidence within the governing legal framework. Moreover, this remark followed its comments that it wished it could reach a different result in light of the consequences of the verdict, the court's familial relationships with mentally ill individuals, and its resulting empathy with *appellant's* family. In that context, the court's remark that its decision was driven by justice for Fisher's family "and just the right result" appeared to mean that the court had resisted potential bias in appellant's favor.

60 Cal.4th at 675.)  Instead, they argue there is no reasonable probability the court would have granted the request, relying solely on the court's denial of defense counsel's oral *Romero* motion.

We disagree with the People.  The court's denial of the *Romero* motion reflected only a finding that no extraordinary circumstances warranted departure from the three strikes law.  (See *People v. Carmony* (2004) 33 Cal.4th 367, 378; *People v. Johnson* (2019) 32 Cal.App.5th 26, 69 [rejecting argument that trial court's denial of *Romero* motion showed it would not have stricken serious-felony enhancement].)  In denying the *Romero* motion and sentencing appellant, the court made no comments indicating it approved of the 55-year determinate term of appellant's sentence.  Further, in finding appellant sane, the court indicated the consequences of its decision had weighed heavily on it, and expressed a wish that a different result were possible.  We cannot say there is no reasonable probability that had defense counsel asked the court to strike the enhancement, the court would have exercised its discretion to reduce the determinate term of appellant's sentence from 55 to 50 years. We therefore remand for a hearing at which the court will decide whether to exercise that discretion.

## DISPOSITION

The judgment is affirmed. The matter is remanded with directions to the trial court to decide, at a hearing at which appellant has the right to be present with counsel, whether it will exercise its discretion to strike the enhancement imposed under Penal Code section 667, subdivision (a). (See *People v. Rocha* (2019) 32 Cal.App.5th 352, 359-360.) If the court elects to strike the enhancement, it shall resentence appellant, issue a new abstract of judgment, and forward the new abstract of judgment to the California Department of Corrections and Rehabilitation. If the court elects not to strike the enhancement, appellant's original sentence shall remain in effect. (See *id.* at 361; *People v. Buckhalter* (2001) 26 Cal.4th 20, 35.)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

MANELLA, P. J.

We concur:

WILLHITE, J.

CURREY, J.

71